WEST CHICAGO STATE BANK, Plaintiff and Counterdefendant-Appellee, v. JOHN H. ROGERS *et al.,* Defendants and Counterplaintiffs-Appellants (West Chicago State Bank, Third–Party Defendant-Appellee).

Second District   No. 2—87—0024

Opinion filed October 30, 1987.—Rehearing denied December 16, 1987.

840

Edward T. Graham, of Wheaton, for appellants.

Robin R. La Follette, of Morrissey & Kay, of Oak Brook, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

The defendants and counterplaintiffs, John and Bernice Rogers (Rogers), appeal from a jury verdict denying them damages on their counterclaim and third-party complaint against the plaintiff and counterdefendant, West Chicago State Bank.

John Rogers was a general contractor who from time to time purchased vacant properties and developed them with single-family residences, which he would then sell. Beginning in 1971, the Rogers established a banking relationship with West Chicago State Bank (hereinafter bank). On May 17, 1971, the Rogers entered into a trust agreement with the bank, which was dated May 17, 1971, and known as trust No. 260. Three vacant lots and one improved lot, collectively known as the "Norris" property, were conveyed into trust No. 260 at that time.

On December 12, 1972, Rogers conveyed lots 1, 2, 3, 4, and 5 of Rogers Resubdivision, which was known as the "Highlake" property, to the bank using the bank's regular form of deed in trust, conveying title to the bank as trustee under trust agreement dated December 12, 1972, and designated as trust No. 260. According to John Rogers, although he used trust No. 260, in so designating the trust agreement as

one dated "December 12, 1972," he intended to have the Highlake property held in a separate land trust at the bank.

During 1976, Rogers purchased three more properties, referred to as the "Pearl Street" property, the "National Street" property, and the "Ray Street" property. Although the grantee on the deed was designated by Rogers as "West Chicago State Bank Trust No 260," Rogers had the deeds recorded but kept them rather than delivering them to the bank.

From 1971 to 1983, Rogers borrowed various sums from the bank to finance the construction of new residential developments. As these residential developments were sold by Rogers, notes with the bank were paid either with cash from the proceeds of sale or by substituting renewal notes for the unpaid amounts. According to John Rogers, as funds were needed to finance construction, he would go to the bank and talk to the president of the bank, who would tell him to go ahead with the work and that the bank would cover him financially for those particular jobs. The bank had given Rogers packets of blank notes. Rogers would bring in a note signed by both his wife and himself. The bank would fill in the rest of the note and deposit the money into Rogers' account. Between 1971 and 1983, Rogers signed as many as 80 to 90 such notes, following the same procedure each time. Occasionally, when a note came due and no funds were available to pay it, John Rogers would bring in another note, and the bank would either roll over the interest onto the principal of the new note, or, if the interest could be paid, then the old note would simply be extended.

The bank always inserted the interest rate after the note had been signed by the Rogers. The rates had started out at 8% and gradually increased to 16%. On one occasion, Rogers received back a note which had been at 10%. He complained to the president of the bank about the high rates, only to be told that since the prime rate was 22%, Rogers should not complain.

On June 20, 1974, Rogers executed an assignment to secure indebtedness in which Rogers assigned to the bank their interest in trust No. 260. The assignment identified trust No. 260 as being dated May 17, 1974, and not May 17, 1971, the date the trust agreement for trust No. 260 was actually executed.

Between June 3, 1981, and August 14, 1981, Rogers executed four notes to the bank, each one secured by trust No. 260. Three of the notes were renewal notes, as follows: (1) note dated June 3, 1981, in the amount of $156,483.75, due on November 1, 1981, at an interest rate of 16.22% per annum; (2) note dated August 14, 1981, in the amount of $93,825.85, due February 10, 1982, at an interest rate of

16% per annum; (3) note dated June 3, 1981, in the amount of $13,031.36, due November 30, 1981, at an interest rate of 16.22% per annum. The fourth was a new note dated June 25, 1981, in the amount of $13,000, due on December 22, 1981, at an interest rate of 16.22% per annum.

Rogers failed to pay the notes as they came due. In April 1983, Rogers received a notice of sale of collateral which informed Rogers that the bank would sell 100% of Rogers' beneficial interest in what was described as "Trust Order Agreement Dated May 17, 1971 and known as Trust No. 260."

On May 11, 1983, pursuant to section 9—504 of the Uniform Commercial Code (Ill. Rev. Stat. 1983, ch. 26, par. 9—504), the bank conducted a sale of Rogers' properties in trust No. 260. The bank was the only bidder at the sale and purchased the property for $243,300, basing its bid on the underlying appraisals of the properties less certain deductions. After the sale, John Rogers contacted the bank and advised John Rodelli, the bank's executive vice-president, that the Highlake property was not in a trust dated "May 17, 1971." Rodelli advised him to contact the bank's attorney. However, Rogers had neither appeared at the sale nor had he notified the bank prior to the sale that the Highlake property was not a part of trust No. 260 that was dated May 17, 1971, even though a description of the property was included in the notice of sale.

Following the sale, the bank first became aware that the Pearl, National, and Ray Street properties were a part of trust No. 260. Subsequently and without further notice to Rogers, the bank sold the Norris lots, the National and the Ray Street properties, and one-half of the Highlake property.

On September 1, 1983, the bank filed an action to recover a deficiency judgment against Rogers. The deficiency was based upon $360,043.89, the amount due on the four notes plus 16% interest calculated to apply to the deficiency from May 11, 1983, the date of the sale, less $243,300, the bank's bid at the sale. Rogers answered the complaint denying that any amount was due the bank and counterclaimed against the bank for the excess in value of Rogers' property, which had been appraised at $507,600, over the alleged amount of any indebtedness due the bank.

On December 17, 1984, the bank amended its complaint to include counts seeking to reform the deeds to the Pearl, National, and Ray Street properties to include the May 17, 1971, date of trust No. 260. The amended complaint also sought to have the deed to the Highlake property and the assignment reformed to reflect the proper date of

trust No. 260, as dated May 17, 1971, not May 17, 1974.

On March 19, 1985, Rogers filed a third-party complaint against the bank, as trustee, alleging that the bank was guilty of a breach of trust and conversion of Rogers' property. The third-party complaint charged that the bank had violated its fiduciary duty owed to Rogers and converted Rogers' property, when without Rogers' consent, it sold certain parcels of land held by the bank as trustee for Rogers to satisfy notes owed by Rogers to the bank, since the notes were secured by an assignment of Rogers' interest in a nonexistent trust.

On April 10, 1985, the trial court ordered the proceedings bifurcated so that the issues regarding the reformation of the deeds and assignment could be determined by the chancery court. Subsequently, over the objections of Rogers, the chancery court preliminarily ruled that it would determine the issue of "commercial reasonableness."

At the conclusion of the trial on the equitable issues, the chancery court found that the notice of sale was adequate as a matter of law, and that the bank had established a *prima facie* case on the issue of whether the sale was conducted in a commercially reasonable manner. The chancery court also found that the Pearl, Ray, and National Street properties were conveyed to the bank under trust No. 260 and became a part of the corpus of that trust regardless of the fact that Rogers did not notify the bank of the transaction or send it copies of the deeds. The chancery court reformed the deed to the Highlake property to reflect that trust No. 260 was dated May 17, 1971. The chancery court found that the date of December 12, 1972, found on the deed to the Highlake property and the May 17, 1974, date found on the assignment were "clearly erroneous." There was no subsequent amendment to the May 17, 1971, trust agreement, and, therefore, the May 17, 1971, date was controlling.

A jury trial was then commenced on the remaining issues, including the deficiency alleged by the bank and the damages sought by Rogers, *inter alia*, for violations of section 9—507 of the Uniform Commercial Code (Ill. Rev. Stat. 1983, ch. 26, par. 9—507) and for conversion and breach of trust by the bank. The bank presented evidence as to the indebtedness owed by Rogers to the bank. At the close of the bank's case in chief, Rogers moved for a directed verdict on the issue of reasonable notification and commercial reasonableness of the sale, which was denied. Rogers then presented evidence on the issue of the commercial reasonableness of the sale and the value of Rogers' properties, after which the bank put on rebuttal testimony on the issue of value and the calculation of the interest applied to the deficiency by the bank.

The jury returned a verdict for Rogers and against the bank on the bank's complaint for the deficiency, and against Rogers and for the bank on Rogers' counterclaim and third-party complaint. This appeal followed.

Rogers contend, first, that the trial court erred in giving certain jury instructions tendered by the bank. Rogers argue that bank's instructions Nos. 17 and 26 instructed the jury that Rogers' only claim against the bank was one of conversion, thus ignoring Rogers' causes of action under section 9—507 of the Uniform Commercial Code (Ill. Rev. Stat. 1983, ch. 26, par. 9—507) and for breach of trust. Bank's instruction No. 17 provides as follows:

> "John H. Rogers and Bernice E. Rogers, the defendants, have filed a cross-claim claiming that West Chicago State Bank has converted a portion of their property. The defendants have also claimed as an affirmative defense to West Chicago's action that West Chicago State Bank sold the real estate involved in this action in a manner which was commercially unreasonable."

Bank's instruction No. 26 provides as follows:

> "The Defendants have alleged that the Plaintiff converted their property. A conversion is wrongful retention of someone else's property. A party claiming a conversion must show that he had:
>
> (a) an absolute and unconditional right to the immediate possession of the property;
>
> (b) that the party charged with conversion wrongfully assumed control, dominion or ownership over the property; and
>
> (c) that the party charged with conversion refused to surrender possession of the property after the party claiming conversion demanded possession."

■■ ■ Although the bank's instructions informed the jury that Rogers have a claim against the bank for conversion and instructed the jury as to the elements of conversion, neither instruction limits the Rogers' claims to conversion. Rogers take the position that the bank had an obligation to tender instructions as to all aspects of Rogers' case. However, Rogers cite no authority for this novel proposition, nor does it accurately reflect the state of the law in Illinois. A party is responsible for preparing his own jury instructions. (*St. Gemme v. Tomlin* (1983), 118 Ill. App. 3d 766.) Moreover, our review of the record establishes that Rogers failed to tender any proper instructions advising the jury of any additional claims contained in the counterclaim or the third-party complaint. A party may not complain that the trial court failed to tender a jury instruction as to a particular aspect or element of that party's case if that party failed to tender a proper in-

struction relating to that element or aspect. 118 Ill. App. 3d 766, 771.

■■ Rogers also argue that bank's instructions Nos. 54 and 57, when read together with instructions Nos. 17 and 26, prevented the jury from awarding Rogers damages on either the counterclaim or the third-party complaint even though the jury found that the sale of the property was not conducted in a commercially reasonable manner. Instruction No. 54 instructed the jury as to the possible verdicts it could reach given the complaint and the counterclaim, and also, what the bank was required to prove in order to recover under its complaint, and what Rogers were required to prove in order to recover under their counterclaim. Instruction No. 57 instructed the jury as to what Rogers were required to prove in order to recover on their third-party complaint. However, the trial court also gave Rogers' instruction No. 25, which provided as follows:

"If you find that the sale of Rogers' property by the Bank in this case was not conducted in a commercially reasonable manner, you are instructed that Rogers has the right to recover from the bank any loss caused Rogers' by the Bank's failure to conduct the sale of Rogers' property in a commercially reasonable manner."

Therefore, we disagree with Rogers' assertion that the jury was prevented from awarding damages based upon the giving of the bank's instructions.

Rogers also argue that the trial court erred in refusing to give Rogers' instructions Nos. 19, 20, and 21. Rogers' instruction No. 19 provides as follows:

"ROGERS' Counterclaim against the BANK and ROGERS' Third Party Complaint against the BANK are separate and distinct causes of action. You should decide the issue or issues in each case as if the Counterclaim and the Third Party Complaint are two separate suits by ROGERS against the BANK. But so far as the instructions given to you apply to each, they should be applied by you."

■■ We agree with the bank that since the instruction fails to distinguish between Rogers' counterclaim against the bank as a corporate lender and the third-party complaint against the bank as trustee, it was correctly refused by the trial court. Moreover, as the bank points out, the instruction was refused as tendered, and Rogers had additional time to tender a new or modified instruction.

Rogers' instruction No. 20 provides as follows:

"If you find from considering all of the evidence that BANK either failed to give reasonable notification of the sale or that the

sale was not conducted in a commercially reasonable manner, then you are instructed that Rogers' is entitled to recover under both ROGERS' Counterclaim as a civil penalty to be assessed against BANK for BANK'S violation of the law applicable to such sales and ROGERS' Third Party Complaint against the BANK for tortious conversion of ROGERS' property."

Section 9—507(1) of the Uniform Commercial Code provides that persons entitled to notice are entitled to damages for losses due to a failure to follow the provisions of that part of the Act. Further, if the collateral is consumer goods, "the debtor has a right to recover in any event an amount not less than the credit service charge plus 10% of the principal amount of the debt or the time price differential plus 10% of the cash price." Ill. Rev. Stat. 1983, ch. 26, par. 9—507(1).

■■ ■ The above instruction was correctly refused. First, the chancery court had previously determined that the notice of sale was adequate as a matter of law. A court may and should take judicial notice of other proceedings in the same case which is before it and the facts established therein. (*In re Brown* (1978), 71 Ill. 2d 151, 155.) Secondly, the civil penalty of section 9—507(1) applies only to consumer goods, not to a beneficial interest in a land trust. Further, Rogers have not cited and we have not found any legal authority to support Rogers' theory that a commercially unreasonable sale is a tort, nor that the statutory civil penalty is available for tortious conversion. Therefore, we conclude that Rogers' instruction No. 20 was also correctly refused.

Rogers' instruction No. 21 provides as follows:

"If you find from all the evidence that ROGERS are entitled to recover damages under ROGERS' Counterclaim against the BANK, the measure of ROGERS' damages is the difference between the fair cash market value of ROGERS' property on May 11, 1983 and the amount of the BANKS' bid price given at the sale of ROGERS' property on May 11, 1983."

■■ In response, the bank argues that instruction No. 21 incorrectly defines the measure of damages Rogers could recover for a commercially unreasonable sale, the correct measure of damages being the difference between the fair market value of Rogers' property on the date of the sale less the amount of Rogers' indebtedness due the bank on the date of the sale. The bank asserts that if Rogers were allowed to recover the difference between the fair market value of the property less the amount the bank bid at the sale, Rogers would in effect be forgiven the amount of the debt which exceeded the amount the bank bid at the sale. The result would be a windfall to Rogers and

would penalize the bank, a result that was not intended by section 9–507 (Ill. Rev. Stat. 1983, ch. 26, par. 9–507). (*First National Bank v. Lachenmyer* (1986), 146 Ill. App. 3d 1035, 1039.) Rogers' loss is the difference between the fair market value of the property on the day of the sale and the amount of their debt. (*Spillers v. First National Bank* (1980), 81 Ill. App. 3d 199, 206.) Therefore, Rogers' instruction No. 21 was correctly refused as well.

█▌ Next, Rogers contend it was error to deny them a jury trial on the issue of the adequacy of the notice of sale, and that during the jury trial, the burden of going forward on the issue of the commercial reasonableness of the sale was placed, erroneously, on them. We disagree.

The notice provisions of section 9–507 are intended to afford the debtor an opportunity to observe that the sale is conducted in a commercially reasonable manner. (*Spillers v. First National Bank* (1980), 81 Ill. App. 3d 199, 204.) The chancery court, after reviewing the notice and hearing the testimony, determined that the notice was adequate as a matter of law. Since Rogers were only entitled to a jury trial on questions of fact, not on those of law, Rogers were not deprived of a jury trial on that issue. See *Belmar Drive-In Theatre Co. v. State Toll Highway Com.* (1966), 34 Ill. 2d 544.

█▌ Although the chancery court found that the bank had presented a *prima facie* case that the sale of Rogers' property was conducted in a commercially reasonable manner, the bank still presented testimony to establish the same issue in its case in chief. John Rodelli, executive vice-president of the bank, read the notice of sale to the jury, and it was admitted into evidence. The record of the proceedings of the Uniform Commercial Code sale held at the bank was also admitted into evidence. Moreover, the trial court refused to instruct the jury as to the chancery court's determination that the bank had presented a *prima facie* case as to the issue of commercial reasonableness and, instead, instructed the jury as follows:

> "Bank contends by its Complaint, that it is entitled to a deficiency judgment against Rogers in an amount equal to the difference between the price bid at the Sale of Rogers' property by the Bank and the amount of debt owed by Rogers to the Bank on May 11, 1983. In order for Bank to recover such a deficiency judgment against ROGERS, the Bank has the burden of proving that every aspect of the sale in which Bank sold ROGERS' property including the method, manner time, place and terms of the sale were commercially reasonable."

We conclude therefore that no error occurred.

█▌ Next, Rogers contend that they were entitled to a directed

verdict on the issue of whether the bank was authorized to complete the notes signed by the Rogers. They also contend that the trial court erred in giving the bank's instruction No. 25 because it erroneously required the jury to assume that the four promissory notes upon which the bank brought its complaint were completed by the bank as authorized by the Rogers. Bank's instruction No. 25 provides as follows:

"When a person signs and executes a form instrument without filling in all the blanks, such person by implication authorizes the holder of the instrument to fill in the blanks in accordance with the underlying agreement. If you find that the Defendant, ROGERS, executed certain notes without filling in all the blanks and if you further find, that WEST CHICAGO STATE BANK was authorized to complete the notes, you may presume that the note was properly completed by WEST CHICAGO STATE BANK."

Section 3—407 of the Uniform Commercial Code provides in pertinent part as follows:

"(1) Any alteration of an instrument is material which changes the contract of any party thereto in any respect, including such change in
\*\*\*

(b) an incomplete instrument, by completing it otherwise than is authorized; \*\*\*
\*\*\*

(2) As against any person other than a subsequent holder in due course

(a) alteration by the holder which is both fraudulent and material discharges any party whose contract is thereby changed unless that party assents or is precluded from asserting the defense;

(b) no other alteration discharges any party and the instrument may be enforced according to its original tenor, or as to incomplete instruments according to the authority given." Ill. Rev. Stat. 1983, ch. 26, par. 3—407.

In his testimony at the jury trial, John Rogers denied giving the bank any authorization to fill in the blank spaces on the notes which his wife and he had signed. However, he also testified that when he needed money, his wife and he would sign another note and bring it to the bank. He also testified that at the time he executed the four notes which were the reason for the sale and the deficiency complaint, he knew that the bank was charging 16% interest, and he had in fact complained about it.

The bank's instruction No. 25 required the jury to determine if the bank was authorized to complete the notes before the jury could presume that the note was properly completed by the bank. Nothing in the instruction mandates a finding by the jury that the bank had such authorization.

We conclude therefore that Rogers were not entitled to a directed verdict on the issue of authorization, nor did the court err in giving bank's instruction No. 25.

▪ Next, Rogers contend that the chancery court erred in reforming the deeds to the Highlake, Pearl, Ray, and National Street properties and in reforming the assignment to secure indebtedness.

Reformation of a written instrument is intended to conform to the original intention of the parties, and the mistake or fraud must exist or have occurred at the time the instrument to be reformed was executed. (*Sedlacek v. Sedlacek* (1969), 107 Ill. App. 2d 334, 337.) Rogers argue that no evidence of mistake or fraud in the execution of the deed to the Highlake property was introduced at the hearing before the chancery court. Rogers also rely on *Reinberg v. Heiby* (1949), 404 Ill. 247, 253, wherein our supreme court stated "a court of equity will not entertain an action by a voluntary grantee to reform a deed for mistake against his grantor."

In response, the bank states, without citation to authority, that under Illinois law, no consideration is required for a deed in trust. Failure to support arguments with appropriate authority is a violation of Supreme Court Rule 341(e)(7) and ordinarily requires waiver of any unsupported arguments. (103 Ill. 2d R. 341(e)(7); *Flynn v. Vancil* (1968), 41 Ill. 2d 236.) However, the deed to the Highlake property recites that "it is given for good and valuable consideration." Therefore, we conclude that there was consideration for the deed.

▪ A trial court's finding in a bench trial will not be disturbed unless it is against the manifest weight of the evidence. (*Ruggio v. Ditkowsky* (1986), 147 Ill. App. 3d 638.) A careful review of the record in this case reveals that there was sufficient evidence to support the reformation of the deeds by the chancery court. Elizabeth Marecek, vice-president and trust officer of the bank, testified that the trust numbers at the bank were assigned in sequential numerical order; that only one number would be assigned to a trust; and that more than one trust would not receive the same trust number. Further, according to John Rogers' own testimony, the properties were always conveyed into trust No. 260. Therefore, the trial court did not err in reforming the deed to the Highlake property.

▪ ▪ Rogers also argue that since the deeds to the Pearl, Ray,

and National Street properties were never delivered to the bank, the bank did not have the authority to sell those properties or to have their deeds reformed. To constitute a valid conveyance of realty, there must be not only delivery of a deed by the grantor but also acceptance by the grantee, and it must affirmatively appear that the grantor's intention was that the deed passed the title at the time of the delivery and that the grantor lose all control. (*In re Estate of Williams* (1986), 146 Ill. App. 3d 445, 450-51.) Delivery of the deed is essential and indispensable to render a deed effective as a conveyance. (*Herron v. Underwood* (1987), 152 Ill. App. 3d 144, 154-55.) However, manual transfer of the deed is not indispensable to delivery but is evidence thereof. (*Berigan v. Berrigan* (1952), 413 Ill. 204.) The intention of the grantor is the primary and controlling factor in determining whether there has been a delivery of the deed. (152 Ill. App. 3d 144, 154-55.) Our supreme court has stated:

> "The question of delivery is one of both law and fact. From the facts and attending circumstances is to be determined the legal question as to whether such acts and declarations constitute a legal delivery. [Citation.] In all cases the question of delivery is open to consideration, to be determined from the facts in each particular case." *Creighton v. Elgin* (1944), 387 Ill. 592, 604.

■■ The deeds to the Pearl, Ray, and National Street properties all reflect that they were conveyed to the bank as trustee under trust No. 260, thus evidencing Rogers' intention to convey the property to the bank as trustee. Moreover, since the deeds were recorded, this constituted notice to the whole world, including the bank, as trustee, that Rogers intended this conveyance to the bank. Thus, we conclude that the reformation to the deeds to the Pearl, Ray, and National Street properties was proper.

■■ Rogers argue further that the reformation of the assignment to secure indebtedness was error, since the mistake in listing the wrong date of the trust agreement was made by the bank and reformation is not available to one who by virtue of his own negligence causes the error. *Hyman-Michaels Co. v. Massachusetts Bonding & Insurance Co.* (1955), 9 Ill. App. 2d 13.

A "mutual mistake of fact" exists, for purposes of the reformation of a written instrument, when the contract has been written in terms which violate the understanding of both parties. *Ballard v. Granby* (1980), 90 Ill. App. 3d 13, 16.

■■ John Rogers testified that on June 20, 1974, when the assignment to secure indebtedness was executed there was only one trust

No. 260 in existence. When questioned further by the bank's attorney, Rogers testified as follows:

"Q. And was there a Trust No. 260 dated May 17, 1974?

A. I don't know.

Q. You don't know?

A. (shaking head)

Q. You signed this document, didn't you?

A. Prepared by the bank.

Q. And your wife signed it?

A. Yes.

Q. Did you read it before you signed it?

A. I just assumed that it was what they had before.

Q. You made an assumption without any verification, is that correct, and so you didn't read this document?

A. Yes, I read the document.

Q. Was the document correct when you signed it?

A. I must have overlooked it when I signed it because I don't know.

Q. So this must be a mistake. Is that right?

A. I don't know.

Q. You don't know?

A. The bank would know. I don't.

Q. You don't know how many trusts you had, whether there was one existent?

A. One.

Q. There was one. And this was an oversight on your part, this date, this 1974 date.

A. I signed it because it because that's what they wanted."

It is apparent from the testimony before the chancery court that no trust agreement dated May 17, 1974, ever existed. Moreover, on the basis of the record before us, we are satisfied that the mistake as to the date of the trust agreement was mutual to both parties, and that they had intended the assignment to bear the date of May 17, 1971. We conclude therefore that the trial court did not err in reforming the assignment to secure indebtedness.

Next, Rogers contend that they were denied their right to redeem their properties because the bank failed to inform them prior to the sale what property it intended to sell at the sale. Rogers argue that since the Highlake property was held by the bank as trustee under trust No. 260 and dated December 12, 1972, it was not properly included in the notice of sale since the notice referred only to the property held in trust No. 260 pursuant to the trust agreement dated May

17, 1971. However, the notice of sale included the legal description of the Highlake property. John Rogers testified that he read the notice of sale, but that he did not inform the bank prior to the sale that the Highlake property was not a part of trust No. 260. Rogers did not attend the sale. Shortly thereafter, he tendered the keys to the house located on the Highlake property to Mr. Rodelli.

Rogers argue that the resale of all but four of the properties to third parties without notice to Rogers denied Rogers the right to redeem their property and violated section 9—504 of the Uniform Commercial Code (Ill. Rev. Stat. 1983, ch. 26, par. 9—504). Section 9—504(3) states in pertinent part as follows:

"Disposition of the collateral may be by public or private proceedings and may be by way of one or more contracts. *** [R]easonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor, if he has not signed after default a statement renouncing or modifying his right to notification of sale." (Ill. Rev. Stat. 1983, ch. 26, par. 9—504(3).)

Our reading of the statute does not reveal any requirement of notice to the debtor of a subsequent sale to a third party. In fact, we note that subsection (4) of section 504 provides that "[w]hen collateral is disposed of by a secured party after a default, the disposition transfers to the purchaser for value all of the debtor's rights therein." (Ill. Rev. Stat. 1983, ch. 26, par. 9—504(4).) Nor are we persuaded by the cases cited by Rogers, inasmuch as they involve situations where either the sale did not take place as indicated in the notice or the notice of sale was defective.

The remaining contentions raised by Rogers are supported by argument only, without citation to authority, in violation of Supreme Court Rule 341(e)(7) and are therefore waived. (103 Ill. 2d R. 341(e)(7); *Flynn v. Vancil* (1968), 41 Ill. 2d 236.) Nevertheless, we have examined those contentions and determine them to be without merit.

The judgment of the circuit court of Du Page County is affirmed.

Affirmed.

UNVERZAGT and DUNN, JJ., concur.