*In re* MARRIAGE OF THEODORE DANIEL JOHNSON, JR., Petitioner-Appellant, and SHAWNA SUE JOHNSON, Respondent-Appellee.

Fourth District    No. 4—92—0141

Opinion filed November 12, 1992.

Paul R. Wilson, Jr., Ltd., of Wilson & Lanto, of Rantoul, for appellant.

John B. Hensley, of Dobbins, Fraker, Tennant, Joy & Perlstein, of Champaign, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

Petitioner Theodore Daniel Johnson appeals the trial court's denial of his motion to enforce the judgment of dissolution of marriage and the granting of respondent Shawna Sue Johnson's petition to modify the judgment of dissolution of marriage. The parties were awarded a judgment of dissolution of marriage on May 23, 1989. A paragraph of that judgment indicated Shawna would retain possession of the marital residence, but upon certain conditions, the residence would be sold. One of these conditions, as stated in the judgment, was upon "petitioner's" (Theodore's) remarriage. Theodore remarried and sought to enforce the judgment through a sale of the marital residence. Shawna filed a petition pursuant to section 2—1401 of the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1989, ch. 110, par. 2—1401) to modify the judgment, alleging it should indicate "respondent's" (Shawna's) remarriage would trigger the sale of the residence. The trial court denied Theodore's motion to enforce the judgment and

granted Shawna's petition to modify the judgment. Theodore now appeals those decisions and we affirm the trial court.

Theodore and Shawna were married on August 21, 1982, and their marriage was registered in Champaign County, Illinois. They have two children, Stefanie (born March 4, 1983) and Teddie (born March 26, 1985). Theodore and Shawna were granted a dissolution of marriage on May 23, 1989, upon Theodore's petition for dissolution.

As part of the judgment of dissolution of marriage, they were granted joint custody of the children with Shawna having physical custody and Theodore being allowed reasonable visitation. Paragraph H of the marital settlement agreement (agreement) stated:

> "The parties own, in joint tenancy, a marital residence *** they shall retain ownership of that property in joint tenancy, but Respondent shall have the exclusive possession and the use thereof, and, if he has not already done so, then Petitioner shall forthwith surrender all keys thereto to Respondent. Respondent shall be responsible for making monthly mortgage payments thereon, and Petitioner shall be responsible for paying all taxes and insurance thereon. The parties shall also equally share any maintenance or repair work on the property, that costs $50.00 or more and that is reasonably necessary to maintain or enhance the market value of the property; *** in the event that the parties decide to offer the property for sale, Respondent shall first have the right to buy Petitioner's interest therein from him. Should she choose not to do so, then Petitioner shall have the right to purchase Respondent's interest therein from her. Should he choose not to do so, the property shall be offered for sale *** that parties shall sell the property upon the earliest of the following to occur: (1) *Petitioner's* remarriage, (b) the emancipation of their younger child, or (c) their agreement to do so." (Emphasis added.)

On September 1, 1990, Theodore remarried. Thereafter, on August 5, 1991, he filed a motion to enforce the judgment of dissolution of marriage. In that motion, Theodore recited the facts of the judgment of dissolution and specifically paragraph H of the agreement. Theodore alleged he had remarried and had made demand on Shawna to either exercise her option to purchase his part of the marital residence or to sell the property. Inasmuch as Shawna had failed to respond, Theodore sought an order by the court to force the sale of the property pursuant to the agreement.

On April 12, 1991, Shawna filed a petition pursuant to section 2—1401 of the Code seeking to modify the judgment of dissolution of

marriage. In her petition, Shawna alleged that at all settlement negotiations prior to the dissolution of marriage, as well as at the time the dissolution was awarded, the parties had agreed that it would be her remarriage which would trigger the sale of the marital residence. Shawna asserted the language in paragraph H of the agreement, which stated Theodore's marriage was the event to trigger the sale of the marital residence, was a clerical error. Accordingly, Shawna sought to modify the judgment by striking the word "petitioner" from the last sentence of paragraph H of the agreement and inserting instead the word "respondent." On April 16, 1991, Shawna filed a motion to dismiss (Ill. Rev. Stat. 1989, ch. 110, par. 2—619) Theodore's motion to enforce the judgment of dissolution of marriage.

Thereafter, Theodore filed two motions to dismiss Shawna's section 2—1401 petition pursuant to sections 2—615 and 2—619 of the Code (Ill. Rev. Stat. 1989, ch. 110, pars. 2—615, 2—619). Both of these motions to dismiss were denied.

On May 1, 1991, a hearing was held on Shawna's section 2—1401 petition. Theodore testified he remarried on September 1, 1990. Theodore had hired Burt Greaves to represent him in the divorce proceedings with Shawna and he had authorized Greaves to enter into settlement negotiations. The paramount concern to Theodore during the negotiations was the security and welfare of the parties' two children. Theodore agreed he wished to minimize any disruptions or unpleasant interferences in his children's lives and also agreed that Shawna's major concern was whether she would be able to meet her expenses as she was on a limited income. Theodore agreed to grant her possession of the residence so that she and the children had an adequate place to live.

Theodore recalled the terms proposed during the settlement negotiations and he admitted at one point he wished that Shawna's having a male guest sleeping overnight at the house would be an event to trigger the sale of the house. He recalled other proposed terms regarding the splitting of the profits upon the sale of the house as well as division of who would pay the mortgage, the taxes, and the insurance. Theodore admitted that during the nine months of negotiations, there were times where a proposed term of the agreement would be that Shawna's remarriage would trigger the sale of the residence.

Theodore testified that on May 9, 1989, he, Shawna, and their attorneys met at Shawna's attorney's office to complete the settlement negotiations. At that time, Theodore still wished that Shawna's having male guests overnight would constitute an event which would trigger the sale of the marital residence. However, after Shawna's resist-

ance to this term, Theodore agreed to drop it from the negotiating process. The parties finally agreed upon the terms of the settlement at this time.

After the settlement conference, Shawna's attorney drafted a judgment of dissolution which he thought contained the verbal agreement reached on May 9, 1989, and sent a copy to Greaves. Theodore testified he was handed a copy of the agreement at the courthouse on the day the judgment of dissolution of marriage was granted, at which time he signed it. Shawna was not present at the hearing that day as she had already signed the agreement. Theodore testified that the terms of the agreement were what he had previously agreed to and that is why he signed the agreement.

Theodore's affidavit indicated his rationale in making the agreement was that "I did not wish to remain liable for any outstanding indebtedness on the former marital residence at a time when I married and sought to make a fresh start on my own." Theodore guessed he adopted this rationale at the time he signed the agreement because "the agreement says what it says."

On cross-examination, Theodore admitted he did not remarry until nearly 1½ years after the dissolution. He stated that Greaves did a lot of negotiating for him during the settlement negotiations, but that he had final approval as to any terms. Theodore testified it was not his intention at the time he entered into the agreement to provide a place indefinitely for his wife and any live-in friend she might have nor was it his intention to remain liable on the mortgage on that residence in the event he remarried and was unable to get mortgage financing on his own home. Theodore stated he read the agreement "front to back" before he signed it and it correctly and accurately stated his intentions in the settlement. His purpose in filing the motion to enforce the judgment was to put him in a position where he would not be liable on Shawna's mortgage so that he could secure one for another house.

Finally, on redirect examination, Theodore stated that when he signed the agreement, it was his intention not to remain liable on the mortgage on the marital residence once he started his new life. However, he did not remember discussing that at the settlement conference. But, he believed the settlement conference resulted in what he thought was the agreement he signed.

Shawna testified the first time she became aware that it was Theodore's remarriage which would trigger the sale of the marital residence was when she received a letter from his attorney regarding his demand for her to exercise her option to purchase the house. She

stated she and Theodore reached the final terms of the agreement at the May 9, 1989, conference. Shawna testified that the possibility of Theodore's remarriage triggering the sale of the residence was never discussed throughout the entire negotiations and that the agreement was that her remarriage would trigger the sale of the residence. Shawna believed the agreement merely contained a clerical error. She testified she read the document but did not catch the word "petitioner" instead of "respondent" because she was unfamiliar with legal jargon. She understood that the document, as it reads, states the residence shall be sold upon Theodore's remarriage.

On cross-examination, Shawna stated she read the agreement a couple of times before she signed it and returned it to her attorney. It was her intention that the residence would be sold only upon her remarriage. She agreed to this because she thought, if she would remarry, she would pick up and start anew.

Burt Greaves testified he was hired by Theodore to represent him in his divorce proceedings in the fall of 1987 and the case ended in May 1989. He agreed that Shawna's attorney, John Hensley, prepared and submitted to him, shortly after the final settlement negotiation conference, the judgment of dissolution. Greaves approved it as to form.

He acknowledged that during the course of the negotiations, he and Hensley exchanged correspondence. These letters were admitted into evidence without objection. When Greaves received the proposed judgment, he believed it represented the agreement the parties had reached on May 9. Greaves testified that at the conference on May 9, the agreement the parties reached was that Shawna's remarriage would be the event to trigger the sale of the marital residence. Greaves testified the remarriage of Theodore as a triggering event to sell the residence was "never discussed, never raised, never tendered." Finally, he indicated the exhibits contained discussions of the various events which would trigger the sale of the residence. Greaves believed the agreement erroneously stated something that was not his understanding of the agreement the parties reached at the May 9 conference.

John Hensley testified that he participated in the settlement negotiations with Greaves and that he attended the settlement conference with the parties and Greaves on May 9, 1989. Hensley opined that he made an error when he drafted the judgment of dissolution. This mistake was made by inserting the phrase "petitioner's remarriage" when it should have read "respondent's remarriage." It was his belief that, throughout the entire negotiation process as well as after the

settlement conference, the issue of Theodore's remarriage triggering the sale of the residence was never raised. Hensley stated that given the financial position of both parties, and the fact that the children were residing with Shawna, he would have counseled her not to sign the agreement if such a suggestion had been made. He would not have considered this to be in the best interests of her or the children.

The trial court concluded that Theodore read the agreement and signed it knowing what it in fact stated. The court found Shawna failed to prove by clear and convincing evidence that a mutual mistake occurred. Accordingly, her section 2—1401 petition was denied.

On May 31, 1991, Shawna filed her post-trial motion, which sought to have the court vacate its denial of her section 2—1401 petition, and a motion to amend her petition to include allegations of unilateral mistake accompanied by fraud. Theodore filed a motion to dismiss the post-trial motion. He also filed a motion to strike the motion to amend the petition. Following a hearing on August 20, 1991, the trial court granted Shawna's post-trial motion, vacated the order denying her section 2—1401 petition, and granted her a new hearing on the section 2—1401 petition.

At the hearing on the amended petition, Theodore testified he and Shawna reached a verbal agreement as to the conditions upon which the residence would be sold but that the document that is part of the judgment of dissolution of marriage is not reflective of the verbal agreement they reached. He testified after the May 9, 1989, settlement conference, he and Shawna agreed that the residence would be sold upon her remarriage. He and Shawna had no further discussions between the settlement conference and the court hearing on May 23, 1989.

The first time Theodore saw the written agreement was at the hearing on May 23, 1989, when he signed it. At no time prior to that had he ever seen anything in writing which stated the residence would be sold upon his remarriage. Theodore did not point out the mistake to Hensley at that time nor did he point out the mistake to his attorney or to Shawna. He felt that there was no need to point it out to Shawna because he believed she understood the agreement since she had already signed it. Until May 23, 1989, Theodore was unaware that he and Shawna had reached an agreement that the house would be sold upon his remarriage.

Theodore agreed that at no time did he ever propose to Hensley or Shawna that the house should be sold upon his remarriage. Finally, Theodore stated that after the settlement conference on May 9, the parties had agreed that the house would be sold on the earliest of

three things: (1) their agreement to sell the house; (2) their youngest child reaching 18 years of age; or (3) Shawna's remarriage.

On clarification, Theodore testified he recognized Shawna's signature on the agreement although he had not seen her sign it. He reiterated the fact that he read the agreement and understood that it stated that the residence would be sold upon his remarriage. He explained he waited so long to seek enforcement of the judgment because he was not in a hurry and decided it was time to finally get this matter settled.

Burt Greaves again testified that he represented Theodore during the divorce proceedings and that he conveyed all settlement proposals made by Shawna to Theodore. It was his opinion that the parties had reached an agreement as to all ancillary matters at the May 9 settlement conference. Greaves testified that it was Shawna's remarriage that would trigger the sale of the residence. At the settlement conference, no suggestion was ever made that the house would be sold upon Theodore's remarriage. He stated he never did anything to trick Shawna or exercise any undue influence or coercion over her. Upon questioning by the trial court, Greaves indicated he approved the judgment incorporating the agreement but that it did not correctly reflect the agreement he had reached with Hensley. Greaves was unable to recall exactly when he became aware of this fact. He testified the agreement filed differed from the one he orally reached with Hensley with respect to whose marriage would trigger the sale of the residence. He testified that they had agreed that it would be Shawna's remarriage which would cause the sale of the residence.

The trial court concluded the parties, through their agents, reached a settlement agreement as to all ancillary matters and that Hensley would draft the agreement pursuant to the matters decided at the conference on May 9, 1989. The court further concluded that the day after Shawna signed the document, it was presented to Theodore, but contained a scrivener's error regarding the contingency of the sale of the marital residence. The court specifically found that although the parties agreed that Shawna's remarriage would trigger the sale of the home, the document contained language indicating it was Theodore's remarriage which would cause the sale. Neither of the attorneys noticed the error. However, the court found Theodore did notice the difference in the provision, understood what it meant, and signed the document despite knowing it was different than what had been verbally agreed upon. The court concluded there was no mutual mistake of fact because Theodore was not mistaken about the contents of the document. However, the court found the agents of the

parties made a mutual mistake of fact. The court then granted Shawna's petition to the extent that the judgment of dissolution of marriage should reflect it would be her remarriage rather than Theodore's which would cause the sale of the house. Theodore timely filed his notice of appeal.

For his first issue, Theodore contends the trial court lacked subject-matter jurisdiction to entertain Shawna's section 2—1401 petition. Theodore suggests the trial court's change of the judgment order is equivalent to a property modification. The issue has no merit.

■■ Section 510(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) provides:

"The provisions as to property disposition may not be revoked or modified, unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of this State." (Ill. Rev. Stat. 1989, ch. 40, par. 510(b).)

Provisions of what is construed as a property settlement are not modifiable or revocable unless the court finds the existence of conditions that justify the reopening of a judgment under the laws of this State. *In re Marriage of Lowe* (1981), 101 Ill. App. 3d 317, 318-19, 427 N.E.2d 1367, 1369.

Section 2—1401(a) of the Code provides "[r]elief from final orders and judgments, after 30 days from the entry thereof, may be had upon petition as provided in this Section." (Ill. Rev. Stat. 1989, ch. 110, par. 2—1401(a).) The purpose of the petition is to bring before the court facts which had they been known at trial would have prevented entry of the contested judgment. (*People v. Sanchez* (1989), 131 Ill. 2d 417, 419, 546 N.E.2d 574, 576.) A section 2—1401 petition invokes the equitable powers of the court as justice and fairness require. *Mohr v. Pridemore* (1986), 151 Ill. App. 3d 341, 343, 502 N.E.2d 754, 756.

■ The section 2—1401 petition brought by Shawna was not a property settlement modification which would have violated section 510(b) of the Act. Rather, she brought the petition to merely correct a typographical error and reform the agreement to accurately reflect the intent of all the parties involved. The fact that the agreement stated something other than what the parties had agreed upon would be such as to prevent a court from entering a final order. Inasmuch as Shawna's petition alleged a typographical error, the petition was the proper method of seeking a modification of the judgment. Accordingly, the trial court had subject-matter jurisdiction to hear her petition.

Next, Theodore asserts the trial court erred in considering parol evidence relating to the settlement negotiations. Specifically, he suggests the consideration of the letters between the attorneys prior to the final

settlement conference and the testimony of the witnesses as to what was agreed upon at that conference was improper since the agreement is unambiguous and the parties' intent must be gleaned solely from it.

■ Under the "parol evidence rule," if the instrument appears complete, certain, and unambiguous, then parol evidence of a prior or contemporaneous agreement is inadmissible to vary the terms of the instrument. (*Hartbarger v. S C A Services, Inc.* (1990), 200 Ill. App. 3d 1000, 1009, 558 N.E.2d 596, 601.) An agreement reduced to writing must be presumed to speak the intention of the parties who signed it, which intention is to be determined from the language used and such agreement is not to be changed by extrinsic evidence. (*Shultz v. Delta-Rail Corp.* (1987), 156 Ill. App. 3d 1, 12, 508 N.E.2d 1143, 1150.) It is well settled that the parol evidence rule is no bar to the admission of evidence on the question of mutual mistake, and this is so even when the instrument to be reformed is clear and unambiguous on its face. Thus, parol evidence may be used to show the real agreement between the parties when a mistake has been made and the evidence is for the purpose of making the contract conform to the original intent of the parties. (*Beynon Building Corp. v. National Guardian Life Insurance Co.* (1983), 118 Ill. App. 3d 754, 760, 455 N.E.2d 246, 250.) Parol evidence may be admissible to show the concerns of the parties prior to and contemporaneous with the signing of the written agreement. *Rittenhouse v. Tabor Grain Co.* (1990), 203 Ill. App. 3d 639, 649, 561 N.E.2d 264, 271.

■ A mutual mistake which may be established by parol evidence is a mistake common to both contracting parties wherein each labors under the same misconception; thus, when there is a mutual mistake, the parties are in actual agreement but the agreement in its written form does not express the parties' real intent. Parol evidence is admissible to establish the fact of fraud or mistake. (*Bank of Naperville v. Holz* (1980), 86 Ill. App. 3d 533, 538, 407 N.E.2d 1102, 1106.) When a mutual mistake or fraud is alleged, parol evidence is admissible to show the true intent and understanding of the parties. The parol evidence rule is no bar to the admission of evidence on the question of mutual mistake or fraud. *Ballard v. Granby* (1980), 90 Ill. App. 3d 13, 16, 412 N.E.2d 1067, 1070.

■ The trial court properly considered parol evidence to show the real agreement between the parties and their intentions. Shawna alleged a mutual mistake of fact in her section 2—1401 petition and thus parol evidence was admissible to show the true intent and understanding of the parties. All the witnesses testified that the parties agreed on May 9, 1989, that Shawna's remarriage would trigger the sale of the

marital residence. Thus, they were mistaken about a fact contained within the agreement. Theodore testified he realized the agreement read differently than what had previously been agreed upon; however, he chose to remain silent about this difference. Regardless of Theodore's motives for remaining silent, he realized the agreement contained a mistake of fact. The agreement contained a fact which was different than what was agreed upon earlier. Hence, the evidence established a mutual mistake of fact and the court properly considered parol evidence of the settlement negotiations.

Theodore next alleges the trial court erred in allowing into evidence the testimony of Burt Greaves. He suggests several of Greaves' statements are matters protected by the attorney-client privilege and thus inadmissible. Shawna responds that these matters were not privileged communications but merely the terms of the parties' negotiated settlement.

■ The purpose of the attorney-client privilege is to encourage and promote full and frank consultation between a client and legal advisor by removing the fear of compelled disclosure of information. (*Consolidation Coal Co. v. Bucyrus-Erie Co.* (1982), 89 Ill. 2d 103, 117-18, 432 N.E.2d 250, 256.) The essential elements for the creation and application of the attorney-client privilege have been defined as follows:

> " ' "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived." [Citation.]' " (*People v. Williams* (1983), 97 Ill. 2d 252, 294, 454 N.E.2d 220, 240, quoting *People v. Adam* (1972), 51 Ill. 2d 46, 48, 280 N.E.2d 205, 207.)

The attorney-client privilege only applies to matters that are confidential. (*McDonald's Corp. v. Butler Co.* (1987), 158 Ill. App. 3d 902, 913, 511 N.E.2d 912, 920.) In order to be a confidential communication protected by the attorney-client privilege, the parties must have intended that the contents of that communication not be disclosed to a third party other than in the rendition of legal services. (*People v. Adams* (1983), 116 Ill. App. 3d 315, 322, 451 N.E.2d 1351, 1356.) Further, the attorney-client privilege is limited solely to those communications which the client expressly made confidential or which he could reasonably believe under the circumstances would be understood by the attorney as such. (*Waste Management, Inc. v. International Surplus Lines Insurance Co.* (1991), 144 Ill. 2d 178, 190, 579 N.E.2d 322, 327.) A communication for purposes of disclosure is not privileged. (*In re Estate of Ragen* (1979), 79 Ill.

App. 3d 8, 15, 398 N.E.2d 198, 203.) Communications made by a client to an attorney for the purpose of being disclosed by him to others do not fall within the rule of privilege. (*Spencer v. Burns* (1952), 413 Ill. 240, 248, 108 N.E.2d 413, 417.) Matters which the client intends his attorney to disclose to a third person (who is not the agent of either the client or the attorney) are not privileged. *People v. Werhollick* (1970), 45 Ill. 2d 459, 462, 259 N.E.2d 265, 266.

The following are the statements which Theodore claims were privileged communications:

(1) the remarriage of Theodore as an event to trigger the sale of the residence "was never discussed, never raised, never tendered";

(2) to the best of Greaves' knowledge, Theodore's remarriage as a trigger for the sale of the marital residence at no time played a part in the settlement negotiations;

(3) Greaves thought he knew what the parties had agreed to after the May 9 conference and he expected the agreement drafted by Shawna's attorney would so reflect;

(4) Greaves' belief that the agreement does not accurately reflect the verbal agreement reached by the parties;

(5) Greaves informed Theodore of all settlement proposals made on Shawna's behalf by her attorney during the negotiations;

(6) Greaves conveyed all offers authorized by Theodore to be so conveyed to Shawna's attorney;

(7) Greaves' opinion that the settlement of all ancillary matters had been reached by the parties on May 9;

(8) at the time the judgment was entered, it had not been brought to Greaves' attention that the draft settlement agreement incorporated into the judgment did not accurately reflect what had been reached in the May 9 conference with respect to the triggering event of the sale of the marital residence; and

(9) Greaves did not learn of the discrepancy in the judgment until much later after its entry.

■ None of these statements by Greaves can be characterized as confidential communications. They all involve the terms of the negotiations between the parties which by their very nature are not intended to be confidential. Likewise, Greaves' beliefs that the parties had reached an agreement on May 9, and that the written agreement did not accurately reflect what he believed had been orally agreed upon, are not confidential communications. They are not statements made by Theodore to Greaves; they are simply Greaves' beliefs. Accordingly, the testimony of Greaves did not violate the attorney-client privilege.

Last, Theodore argues Shawna failed to carry her burden of proof to support the trial court's granting of her section 2—1401 petition. He suggests Shawna failed to establish either mutual mistake of fact or a unilateral mistake coupled with fraud by clear and convincing evidence.

■ To be entitled to relief under section 2—1401, the petitioner must affirmatively set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense or claim; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2—1401 petition for relief. The quantum of proof necessary to sustain a section 2—1401 petition is a preponderance of the evidence. Whether a section 2—1401 petition should be granted lies within the sound discretion of the circuit court depending upon the facts and equities presented and will be disturbed on review only if the reviewing court finds an abuse of discretion. *Smith v. Airoom, Inc.* (1986), 114 Ill. 2d 209, 220-21, 499 N.E.2d 1381, 1386.

A petition under section 72 of the Civil Practice Act (Ill. Rev. Stat. 1965, ch. 110, par. 72) (now section 2—1401 of the Code) has been recognized as a proper ground for relief for a divorce decree which incorporates a written agreement which fails to express the real intention of the parties through mutual mistake, or through mistake of one side and fraud on the other where the proof clearly and convincingly shows that a mistake was made and that it was mutual and common to both parties. (*Groak v. Groak* (1965), 64 Ill. App. 2d 439, 442-43, 212 N.E.2d 139, 141.) Relief has been deemed available under section 72 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 72 (now section 2—1401 of the Code)) if a divorce decree incorporating a written agreement fails to express the real intentions of the parties because of a mutual mistake concerning a property settlement. *In re Marriage of Shelton* (1984), 127 Ill. App. 3d 775, 781, 469 N.E.2d 618, 623.

■ In order to entitle a party to reformation of a contract, he must show a mistake by both parties or a mistake by one party which is known and concealed by the other party. (*Michigan Avenue National Bank v. Evans, Inc.* (1988), 176 Ill. App. 3d 1047, 1056, 531 N.E.2d 872, 878.) A "mutual mistake of fact" exists for purposes of the reformation of a written instrument, when the contract has been written in terms which violate the understanding of both parties. *West Chicago State Bank v. Rogers* (1987), 162 Ill. App. 3d 838, 851, 515 N.E.2d 1261, 1270.

■ Shawna sustained her burden of proof to show a mutual mistake of fact by the parties. First, a mutual mistake of fact occurred because Shawna established through the testimony of herself and the attorneys as well as Theodore that at the conference on May 9, the parties

agreed that it would be her remarriage which would trigger the sale of the marital residence. Even Theodore agreed that at the May 9 conference, it was Shawna's marriage which would trigger the sale of the residence. Shawna testified that she was unaware that there was a mistake in the settlement agreement until she received a demand from Theodore to exercise her option to purchase his interest in the property. Theodore testified he was aware of the mistake at the time he signed the agreement on the 23rd of May just prior to the entry of the judgment of dissolution. This indicates that he was aware there was a mistake, and that the agreement reflected something that was not the agreement of the parties, as had been previously reached. Thus, there was a mutual mistake of fact as to what was contained in the agreement subsequently incorporated into the judgment of dissolution.

In conclusion, we affirm the trial court's granting of Shawna's section 2—1401 petition. First, the trial court had subject-matter jurisdiction to hear her petition. Second, parol evidence was properly admitted to determine the true intentions of the parties because Shawna alleged mutual mistake even though the agreement was unambiguous on its face. Third, the testimony of Theodore's attorney, Burt Greaves, did not invade the attorney-client privilege as the matters to which he testified were not confidential communications. The evidence is overwhelming that the idea of Theodore's remarriage triggering the sale was never discussed prior to the agreement being prepared and was not a part of the agreement. Nowhere in the husband's testimony at the negotiation stage did he ever mention the issue of selling the house when he remarries. It is a strain on the system of justice to find any merit to the ex-husband's petition and his appeal certainly could be considered to be frivolous. Shawna sufficiently carried her burden of proof by establishing through clear and convincing evidence mutual mistake of fact.

Affirmed.

GREEN, P.J., and KNECHT, J., concur.