In re FBN FOOD SERVICES, INC., Debtor.

James E. CARMEL, Trustee, Plaintiff,

v.

RIVER BANK AMERICA, a New York Banking Corporation, Quest Realty Corp., a Delaware Corporation and Quest Equities Corp., a New York Corporation, Defendants.

Bankruptcy Nos. 91 B 08983, 92 A 0961.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Dec. 6, 1994.

Vincent J. Syracuse, Ralph A. Siciliano, David A. Pellegrino, John–Patrick Curran, Newman Tannenbaum Helpern Syracuse & Hirschtritt, New York City, and Louis W. Levit, Ross & Hardies, Chicago, IL, for defendants.

John K. Kneafsey, Nisen & Elliott, Chicago, IL, for trustee.

James E. Carmel, Trustee, Carmel, Baker & Marcus, Ltd., Chicago, IL.

### *MEMORANDUM OPINION*

SUSAN PIERSON SONDERBY, Bankruptcy Judge.

> The delightful quality of fraud lies
> in its infinite variety ... [1]

### INTRODUCTION

This matter revolves around the events leading up to and culminating in a two day mediation conference at which Sizzler Restaurants International, Inc. ("Sizzler") paid $4,175,000 to settle litigation between itself,

---

1. Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr.Dev.J. 55 (1991) *citing* G. Glenn, Fraudulent Conveyances and Preferences, § 325a, at 566 (rev. ed. 1940).

FBN Food Services, Inc. ("FBN") and Midwest Restaurant Concepts, Inc. ("MRC"). Pursuant to the settlement agreement, Sizzler paid $1.4 million to Quest Equities, Inc. ("Quest Equities"), a shareholder of FBN. Quest Equities' parent company, River Bank America ("River Bank"), applied that amount to reduce the debt on a $7.5 million loan that it made to SIG Food Services Associates, L.P. Shortly thereafter, an involuntary Chapter 7 bankruptcy petition was filed against FBN and an order for relief entered. Subsequently, the Trustee filed this fraudulent conveyance action which opened a pandora's box. The Trustee contends that the transfer of money to River Bank was a fraudulent transfer which should be avoided pursuant to Sections 548 and 550 of the Bankruptcy Code.[2] After considering the testimony, exhibits admitted into evidence, briefs submitted by the parties, and arguments of counsel, the Court agrees. Accordingly, the $1.4 million fraudulently transferred to River Bank is hereby avoided.[3]

## BACKGROUND

### FBN

The relevant facts are as follows.[4] In 1986, FBN was formed to act as the operating company for certain Sizzler restaurants. [UF ¶ 9(b)] FBN was authorized and licensed to operate those restaurants pursuant to certain license agreements. [UF ¶ 9(b)] The shareholders of FBN were Anthony Basile ("Basile") (25%), Quest Equities (37.5%), and SIG Partners (37.5%).[5] [UF ¶ 9(b)] Quest Equities was in the business of making loans and equity investments, and was a wholly owned subsidiary of River Bank.[6] [UF ¶ 5] Both Basile, and Gerald Kaufman, one of the partners of SIG Partners, signed personal guarantees of FBN's various obligations to Sizzler. [UF ¶ 30, 31] Basile was the president of FBN and was responsible for the operation of the restaurant facilities. [Tr. 91] FBN leased the Sizzler restaurants and the furniture, fixtures, and equipment (the so-called "hard assets") for the restaurants from SIG Food Services Associates, L.P. ("SFSA").[7] [UF ¶ 9(b)]

SFSA's financing for the acquisition of real estate and hard assets came from two principal sources. In August 1987, River Bank loaned $7.5 million to SFSA pursuant to a mortgage note ("River Bank Loan"). [UF ¶ 17] The River Bank Loan was not secured

---

**2.** Unless otherwise stated, all statutory citations refer to the Bankruptcy Code, 11 U.S.C. §§ 101–1330.

**3.** This decision incorporates the Court's findings of fact and conclusions of law pursuant to Fed. R.Bankr.P. 7052.

**4.** Due to the extensive record in this case, the Court cited various parts of the record which support the findings of facts for purposes of clarity. These references are not meant to be exclusive. "Tr __" refers to pages of the transcript of the trial in this adversary proceeding. "D.Ex. __" refers to the exhibit which the Defendants had admitted into evidence, and "P.Ex. __" refers to the exhibit which the Plaintiff/Trustee had admitted into evidence. "UF __" refers to certain uncontested facts which were stipulated to by the parties prior to trial in their joint pretrial statement.

**5.** SIG Partners was a New York general partnership owned by Stuart Seigel ("Seigel"), Irwin Cohen ("Cohen"), and Gerald Kaufman ("Kaufman"). [UF ¶ 8]

**6.** River Bank America ("River Bank") is a state-chartered FDIC-insured New York savings bank. [UF ¶ 4]

**7.** SFSA's general partner was SIG Food Services, Inc., an Illinois corporation, whose stock was owned by Basile (25%), SIG Partners (37.5%), and Quest Equities (37.5%). SFSA's limited partners were Basile (24.75%), SIG Partners (37.125%), Quest Equities (37.125%). SIG Food Services, Inc. owned a 1% interest in the limited partnership. [UF ¶ 9(a)].

SFSA also leased its restaurant facilities and other "hard assets" to Chicago Diversified Foods, Inc. ("CDF"). CDF is an Illinois corporation which operated certain Taco Bell franchises in the Chicago area. CDF entered into franchise agreements with Taco Bell for the operation of its restaurants. At the time of its formation, the shareholders in CDF of the issued and outstanding stock, were Quest Equities (37.5%), SIG Partners (37.5%), and Basile (25%). [UF ¶ 9(c)]. CDF, FBN, and SFSA had management agreements with QSC Management Corp., an Illinois corporation ("QSC"). At the time of its formation, the issued and outstanding stock in QSC was owned as follows: Quest Equities (37.5%), SIG Partners (37.5%) and Basile (25%). [UF ¶ 9(e)].

by any of the assets of FBN or MRC. [UF ¶ 18; D.Ex. 13] In addition to the $7.5 million loan, SFSA borrowed $100,000 from Basile who in turn borrowed $100,000 from Quest Equities. Quest Equities' $100,000 loan to Basile was evidenced by a promissory note. [UF ¶ 19, 20, 47] In 1988, American National Bank & Trust Company of Chicago ("ANB") loaned $6.5 million to SFSA ("ANB Loan"). [Tr. 271–272; P.Ex. 5] In order to obtain that loan, River Bank was required to subordinate the River Bank Loan and any security interests it had to those of ANB via an intercreditor agreement. [Tr. 272; P.Ex. 5]

## MRC

Like FBN, Midwest Restaurant Concepts, Inc. was another operating company for Sizzler restaurants. [UF ¶ 9(d)] MRC was related to FBN and SFSA in that all the companies had common ownership. The shareholders of FBN and MRC, and the main limited partners of SFSA were Anthony Basile, Quest Equities, and SIG Partners.[8] [UF ¶ 9(b)] However, unlike FBN, MRC leased its restaurant facilities and hard assets directly from Sizzler, not from SFSA. [UF ¶ 9(d)] Sizzler required FBN, Basile, and Kaufman to sign separate guarantees for MRC's obligations under the leases. [UF ¶ 28] Further, FBN, Basile, and Kaufman guaranteed payments due to Sizzler from MRC under the license agreements. [UF ¶ 28; Tr. 111]

In or around April 1989, ANB loaned $4 million to MRC to purchase additional Sizzler franchises. [UF ¶ 23] This loan was secured in part by a leasehold mortgage on the restaurant premises leased by MRC from Sizzler. [UF ¶ 23] As part of this transaction, at ANB's option, Sizzler was obligated to buy back the MRC assets for ANB's benefit. [UF ¶ 26; Tr. 108] In such a case, MRC, FBN, Basile, Kaufman, and others were liable to Sizzler for repayment (hereinafter "Affiliate Agreement"). [UF ¶ 26, 28; Tr. 107]

8. See Table 1 for the structure of the various entities.

## REFINANCING OF LOANS

Shortly after River Bank loaned $7.5 million to SFSA, SFSA defaulted. River Bank enlisted the help of William Landberg to arrange for $1 million to be loaned to SFSA to paydown the River Bank Loan. [Tr. 274] Avrum Waxman ("Waxman"), the president of River Bank and an officer and director of Quest Equities, told Basile that if he assisted Landberg in his attempt to refinance the River Bank Loan, then River Bank would forgive Basile's $100,000 promissory note to Quest Equities. [Tr. 274–275]

Additionally, in the fall of 1989, River Bank employed Stephen Mann ("Mann") to assist in a restructure of the loan. [Tr. 277–278] Between that time and March 1990, a number of attempts were made to refinance the River Bank Loan. [Tr. 277–278; 622–628; 1482] Landberg eventually guaranteed the repayment of a $1 million loan made by World Life & Health Insurance Company of Penna to SFSA. [Tr. 277–278] In return for this guarantee, Landberg received Quest Equities' interest in SFSA, FBN, and the related entities in October 1990. [P.Ex. 49]

## FBN COMPLAINT

On another front, a dispute arose between FBN, MRC, and Sizzler, over the license agreements. FBN and MRC filed a complaint against Sizzler in February 1990 in the United States District Court for the Northern District of Illinois (hereinafter referred to as the "FBN Complaint").[9] [UF ¶ 24] FBN alleged that it was treated differently from other franchises because it was required to pay substantial amounts for advertising contributions which the other franchises were not required to pay. [D.Ex. 54] Further, FBN contended that it entered into the Sizzler license agreements as a result of the misrepresentations and fraudulent conduct of Sizzler. [D.Ex. 54] FBN claimed damages against Sizzler based on fraud and a breach of covenant of good faith and fair dealing. [D.Ex. 54]

Sizzler asserted counterclaims against FBN in the FBN Complaint seeking dam-

9. The action is entitled *FBN Food Services, Inc. v. Sizzler Restaurants International, Inc., et al.,* case No. 90 C 1001. On or about April 6, 1990, FBN filed an amended complaint. [D.Ex. 54]

ages based upon FBN's default of its obligations under the license agreements, as well as various other claims. [D.Ex. 53] Sizzler also asserted counterclaims against Quest Equities, SFSA, Kaufman, and Basile based on the theory that said parties were "alter-egos" of FBN. [D.Ex. 53—¶ 69] By June 1990, FBN had ceased doing business, closed its restaurants and was insolvent. [Tr. 82–83, 290, 532–535; P.Ex. 33A]

## SIZZLER ARBITRATION

MRC ceased doing business in the Spring of 1990. Around that time, ANB exercised its option to require Sizzler to buy back the MRC assets. [Tr. 541] Sizzler paid ANB approximately $4 million. [Tr. 541] In return, Sizzler obtained possession of twelve MRC restaurants, equipment, and leasehold improvements. [Tr. 541] On or about April 11, 1990, Sizzler instituted an arbitration proceeding in California against MRC (the "Sizzler Arbitration").[10] [D.Ex. 56] Sizzler asserted claims against MRC based on the breach of the license agreements, leases, and reimbursement of their claim pursuant to Sizzler's payment to ANB for the purchase of the MRC assets. [D.Ex. 56] Sizzler also made claims against FBN, Basile, and Kaufman, based on their guarantees of the MRC license agreements and the MRC leases, and for the amount that Sizzler was required to pay ANB for the purchase of the MRC assets. [UF ¶ 26; D.Ex. 56] All of these claims were at issue in the Sizzler Arbitration. Sizzler did not assert any claims against Quest Equities or River Bank in the arbitration. [D.Ex. 56]

MRC asserted counterclaims in the Sizzler Arbitration.[11] [D.Ex. 55] By all accounts, MRC had an extremely weak position. Philip Stahl ("Stahl"), River Bank and Quest Equities' attorney, said MRC would get "creamed" in the Arbitration. [Tr. 1783–1785] Further, Sizzler was not willing to pay

any money to MRC to settle the Sizzler Arbitration. [D.Ex. 7–8; Tr. 140, 336–338] The Sizzler Arbitration was scheduled to go to hearing in October 1990. [Tr. 101–102]

The principal amount of the River Bank Loan was outstanding and unpaid, and interest payments due thereon were substantially in arrears. On September 13, 1990, Stahl met with Waxman, Mann, Nicholas Etten ("Etten"), an attorney representing FBN, MRC, Kaufman, Basile, and the SIG entities, concerning the possibility of River Bank funding the FBN Complaint. [Tr. 1810–1825] Mann was concerned that River Bank did not have an agreement to receive the proceeds from the FBN Complaint first, before FBN. [Tr. 1818] Further, River Bank was subordinated to ANB's loan of $6.5 million to SFSA, on which SFSA had defaulted. [Tr. 334–335]

## SETTLEMENT CONFERENCE

On September 16 and 17, 1990, a mediation conference was held in Chicago in an attempt to resolve all of the pending litigation. [Tr. 148; D.Ex. 7–10] The mediator requested that persons with authority to execute a settlement agreement be present at the Settlement Conference. [Tr. 149–150] Thomas L. Gregory ("Gregory"), the chief executive officer of Sizzler,[12] and two attorneys for Sizzler, David Kenagy ("Kenagy") and William Beynon ("Beynon") were present. [Tr. 311–312] In attendance for FBN were Basile, Kaufman, and Etten. [Tr. 58–59, 311–312] River Bank and Quest Equities were represented by Waxman, Mann, and Stahl. [Tr. 58–59]

Kaufman had had an ongoing business relationship with River Bank since 1984. [Tr. 53] As of the date of the Settlement Conference, he or entities with which he was involved (other than the SIG related entities) owed River Bank between $40 million and $45 million. [Tr. 52] Kaufman had signed

10. The arbitration proceeding was entitled *Sizzler Restaurants International, Inc., as Claimant and Counter–Respondent, and Midwest Restaurant Concepts, Inc., et al., as Respondents and Counter–Claimants*, No. 72 114 0392 90. [D.Ex. 56].

11. MRC was one of the original plaintiffs in the FBN Complaint, but after the commencement of the Sizzler Arbitration, MRC was dismissed as a plaintiff.

12. Gregory, Sizzler's chief negotiator at the Settlement Conference, testified concerning the events at the Settlement Conference. The Court found Gregory to be especially credible. He was the only truly disinterested, impartial third-party who testified regarding the events. His forthright statements and demeanor made Gregory a very reliable witness.

personal guarantees on those loans for between $8 million and $9 million. [Tr. 53] Kaufman attended the Settlement Conference on his own behalf and on behalf of the SIG entities as well as FBN. Kaufman was especially eager to appease River Bank. [Tr. 77]

During the Settlement Conference on September 16, 1990, Etten made a presentation on behalf of FBN, and Kenagy made a presentation on behalf of Sizzler. [Tr. 62] At no time on that day or the following day did any representatives of Quest Equities or River Bank make a presentation or articulate any claims they had against Sizzler. [Tr. 62–63, 160, 312–313, 656] Further, any claim that River Bank had against SFSA for the $7.5 million was not an issue at the Settlement Conference nor was it a claim that was asserted in the FBN Complaint or the Sizzler Arbitration. [D.Ex. 53, 54, 55, 56; Tr. 62–66, 160] On September 17, 1990, the Sizzler party (Kenagy, Gregory, and Beynon) and the non-Sizzler party, (Stahl, Waxman, Mann, Etten, Basile, and Kaufman) were placed in two separate rooms. [Tr. 64–65, 314] In an attempt to resolve the FBN Complaint and the Sizzler Arbitration, the mediator conducted a form of "shuttle diplomacy". [Tr. 63–66, 314–318] The mediator only presented lump sum settlement demands to the Sizzler contingent. [Tr. 66–68, 156–160, 314–324] Sizzler understood that a lump sum would be paid to settle the FBN Complaint and the Sizzler Arbitration. [Tr. 155] Sizzler had already regained possession of MRC's hard assets, including the restaurant facilities, so MRC had no assets Sizzler wanted or was willing to pay any money for. [Tr. 140] Sizzler was not willing to pay MRC any money to settle MRC's claims, but was only willing to pay money to FBN. [D.Ex. 7–8; Tr. 140, 336–338]

No claims of Quest Equities or River Bank were presented to Sizzler during the course of the Settlement Conference. [Tr. 160] Substantial testimony and exhibits were admitted into evidence regarding the alleged claims of Quest Equities. The Court finds that Quest Equities did not assert any claims against Sizzler prior to the execution of the Settlement Agreement. There was no mention of such "claims" made at any meeting or in any communication between Sizzler's attorney and Etten prior to the Settlement Conference. [Tr. 1659–1660, 1667–1673, 1865–1866, 1876–1877; D.Ex. 150] Nor are any such "claims" mentioned in any of the notes or attorneys' records which exist from various meetings between some of the parties. [D.Ex. 150] Some of the claims that Quest Equities alleged it had against Sizzler were based on the "Landberg proposals." The Landberg proposals involved various schemes in which Sizzler or Landberg would purchase the FBN and MRC Sizzlers, resulting in an inflow of cash which could then be used to pay down the River Bank Loan. Any claims based on Sizzler's refusal to purchase FBN and MRC were claims which were properly asserted by FBN and MRC in the Sizzler Arbitration. [D.Ex. 55; Tr. 1873] The "claims" now asserted by Quest Equities are a concept that arose after the Settlement Conference seemingly as a device to fend off litigation which was later instituted by ANB.

Initially at the Settlement Conference, FBN demanded $9 million to settle the FBN Complaint. [Tr. 314, 318] The mediator took various amounts back and forth between the groups, and Sizzler ultimately offered $2.7 million. [Tr. 316] In addition, Sizzler wanted something tangible to take back from the Settlement Conference so that it could justify its outlay of funds. Therefore, Basile, on behalf of SFSA, agreed to sell two parcels of real estate owned by SFSA to Sizzler for a purchase price of $1.5 million. [Tr. 316–318] Subsequently, Gregory and Basile met privately to discuss the real estate. [Tr. 317] Gregory, on behalf of Sizzler, agreed to the purchase of the property and the settlement of the FBN Complaint for a total amount of $4,175,000. [Tr. 318]

Sizzler had no interest in what FBN did with the lump sum payment. [Tr. 154–155, 158, 233–244] Sizzler was only concerned with the total amount of the settlement, and the dismissal of the FBN Complaint and the Sizzler Arbitration. [Tr. 158] After the lump sum had been determined and when Basile returned to the FBN group, Waxman demanded a substantial portion of the funds paid by Sizzler in order to pay down the

River Bank Loan. [Tr. 323–324, 68–69] Waxman insisted that the apportionment of the $4,175,000 be reduced to writing at the Settlement Conference. [Tr. 324] Waxman dictated the terms of the Settlement Agreement, as follows:

> The undersigned parties have mediated all the issues involved in the lawsuit pending in the United States District Court for the Northern District of Illinois, captioned FBN, et. al. v. Sizzler, et. al., 90 C 1001 and the arbitration pending before the American Arbitration Association captioned Sizzler v. MRC, et al., 72–114–U392–90—(collectively the "litigation") They have agreed to settle all claims in the litigation as well as all claims known and unknown . . .

[Tr. 324; D.Ex. 7, 8] According to the Settlement Agreement, Sizzler agreed to pay the following amounts:

FBN—$250,000

SFSA—$1,800,000

River Bank—$625,000

Quest Equities—$1,500,000

[D.Ex. 7, 8] Of the $1.8 million Sizzler would pay to SFSA, $1.5 million was for the purchase of the two parcels of real estate. [D.Ex. 7, 8] The remaining $300,000 received by SFSA was to relieve FBN of a $300,000 loan which was advanced by SFSA. [Tr. 384–385] River Bank was to receive $625,000 in settlement of a $625,000 loan to SFSA, which SFSA had loaned to FBN.[13] [Tr. 381–382] Further, Waxman insisted and directed that $1.5 million be paid directly to Quest Equities. [Tr. 333; D.Ex. 7, 8] Quest Equities was to receive $1.5 million in order to pay down the River Bank Loan. $1.4 million would be credited toward the River Bank Loan, and $100,000 would be paid to Foran, Wiss & Schultz to pay FBN's legal fees. [Tr. 386] FBN was to receive a direct amount of $250,000. [D.Ex. 7, 8] Further, according to the Settlement Agreement, Sizzler exchanged mutual general releases with FBN, Basile, Kaufman, Seigel, Cohen, SFSA, Sig Food Services, Inc., SIG Partners, Quest Equities, River Bank, MRC, QSC, CDF, and Landberg. [D.Ex. 7, 8]

Basile objected to any payment of FBN's funds to Quest Equities. [Tr. 72–73, 324] In response, Waxman threatened to revive a note in the amount of $100,000 which Quest Equities had forgiven in September 1989 because of Basile's refinancing work with Landberg. [Tr. 324, 366, 369] In the past, Waxman had threatened that he would go against Basile's home and sailboat if he did not concede to River Bank's demands. [Tr. 556–57] Kaufman, who had signed personal guarantees of between $8 million and $9 million was in favor of the apportionment in the Settlement Agreement, and pressured Basile to settle. [Tr. 324] In order to be relieved of his personal obligations, Basile signed the Settlement Agreement individually and on behalf of FBN. [Tr. 73–74, 324; UF ¶ 31, 35]

As a result of signing the Settlement Agreement and the exchange of releases, Basile was released from the various personal guarantees he made to Sizzler pursuant to FBN's license obligations to Sizzler. Further, Basile and Kaufman were released from the personal guarantees pursuant to the Affiliate Agreement and the license and lease guarantees for MRC which were valued at $4,025,195. [UF ¶ 29; Tr. 106–107] The appropriate representatives of SFSA, Quest Equities, River Bank, and various other related companies eventually signed the Settlement Agreement. [UF ¶ 35, 36, 37]

### SIDE AGREEMENT

After Basile signed the Settlement Agreement and before anyone else had signed, Waxman, on behalf of River Bank, told Kaufman that he wanted $250,000 from him. [Tr. 325] As a result, a "Side Agreement" was drafted in which Kaufman, Cohen, and Seigel (the partners of SIG Partners) agreed to execute a $250,000 note payable to Quest Equities. [Tr. 325–326; Ex. 9, 10]

### THE AFTERMATH

Sizzler paid $250,000 to FBN, $300,000 to SFSA, and $625,000 to River Bank. [UF ¶ 41, 42] Also, Sizzler cut a check payable for $1.5 million to Quest Equities which was received by River Bank and deposited in a River Bank account. [Tr. 466, 688] River

---

13. This loan was guaranteed by Landberg.

Bank set aside $100,000 in a separate account which eventually was paid to Foran Wiss & Schultz for FBN's legal fees. [Tr. 692] The remaining amount of $1.4 million was recorded on a journal voucher as a credit to an account for Quest Realty and was applied as a reduction of the principal amount of the $7.5 million owed by SFSA to River Bank. [P.Ex. 46A, 46B, 77; Tr. 462–464, 466, 500–501] Quest Realty Corp. ("Quest Realty") is a wholly-owned subsidiary of Quest Holding Company which in turn is wholly-owned by River Bank. [UF ¶ 6] Peter Dinardi, River Bank's chief financial officer, confirmed this in his testimony. [Tr. 688–689] Between November 1990 and May 1991, Timothy Ledwick, subsidiary controller for River Bank, sent statements on behalf of Quest Equities showing that the principal balance of the River Bank Loan was approximately $6.1 million. [P.Ex. 53, 57, 61, 65, 68, 69, 72]

ANB commenced an action against River Bank to recover the $1.4 million that was paid to River Bank pursuant to the Settlement Agreement. [Tr. 1852–1854] ANB claimed in the litigation that River Bank's credit of $1.4 million violated the intercreditor agreement between ANB and River Bank. [Tr. 1852] River Bank filed a counterclaim to enjoin ANB from foreclosing and disposing of its collateral which was also collateral for the River Bank Loan. [Tr. 1852] At the end of 1991, River Bank and ANB entered into an agreement which settled the litigation. [P.Ex. 82] River Bank paid no money to ANB but transferred its $7.5 million mortgage note to ANB. [P.Ex. 82] Further, River Bank acknowledged that River Bank credited $1.4 million to the River Bank Loan. [P.Ex. 82] This is important because pursuant to River Bank's intercreditor agreement with ANB, River Bank agreed to subordinate its indebtedness on the River Bank Loan to the ANB Loan of $6.5 million.

Thereafter, River Bank reversed the journal entries on the River Bank Loan. [P.Ex. 5, 77]

On April 25, 1991, three creditors of FBN filed an involuntary petition for relief under Chapter 7 of the Bankruptcy Code. [UF ¶ 2] An order for relief was entered on June 13, 1991. [UF ¶ 2] James E. Carmel was appointed as trustee ("Trustee"). On July 9, 1992, the Trustee filed his complaint against River Bank, Quest Equities, and Quest Realty to avoid the transfer of $1.4 million. On or about January 6, 1993, the Trustee filed his first amended complaint and on March 30, 1993, the Trustee filed a second amended complaint.

## DISCUSSION

■ Section 548 of the Bankruptcy Code allows a Trustee to avoid a fraudulent transfer of an interest of the Debtor in property within one year of the filing of the bankruptcy case.[14] One of two conditions must be met before a transfer can be avoided as a fraudulent conveyance pursuant to Section 548. The Court must find that actual fraud occurred. In other words, the transfer was made with actual intent to hinder, delay, or defraud a creditor. In the alternative, the Court must find constructive fraud i.e. that the debtor was insolvent on the date of the transfer and received less than a reasonably equivalent value in exchange for the transfer. In this proceeding, the Trustee has proven that $1.4 million was indirectly transferred from FBN to River Bank by both actual and constructive fraud.

Prior to delving into the merits of the fraudulent conveyance action, there is a threshold issue which the Court must address. The Defendants contend that the Court is barred from reviewing any evidence to construe the meaning of the Settlement Agreement and the intent of the parties that

14. Section 548 states in relevant part:
(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

is contrary to the plain language of the document. According to the Defendants, the Settlement Agreement is a final embodiment of the terms between the parties and should be enforced as written. The Defendants contend that since the Settlement Agreement specifically provides for Sizzler to pay Quest Equities the amount of $1.5 million, no evidence may be introduced to prove that FBN had an interest in that money.

█ The Defendants argument is a red herring. The parol evidence rule does not bar evidence which establishes that an agreement was induced by fraud. The "parol evidence rule" is somewhat of a misnomer because it is not a rule of evidence, rather it is a rule of substantive law based upon the substantive rights of the parties.[15] When the parol evidence rule is an issue in a bankruptcy case, the court must apply the law of the state in which it sits in order to resolve whether the rule should be applied. *Matter of Morris Paint and Varnish Co.*, 773 F.2d 130 (7th Cir.1985). In citing Illinois law, the Defendants correctly argue that pursuant to the parol evidence rule, evidence which contradicts the terms of a valid integrated unambiguous document is barred. However, the Court does not need to reach the issue of integration or ambiguity of the Settlement Agreement. Illinois law mandates that extrinsic evidence of the party's intention at the time of the writing is admissible if fraud is alleged in connection with the writing. *Bank of Naperville v. Holz*, 86 Ill.App.3d 533, 41 Ill.Dec. 604, 608, 407 N.E.2d 1102, 1106 (2 Dist.1980); *In re Marriage of Johnson*, 237 Ill.App.3d 381, 178 Ill.Dec. 122, 130, 604 N.E.2d 378, 386 (4 Dist.1992). In other words, parol evidence is admissible when fraud is alleged surrounding the writing. Therefore, where fraud exists the parol evidence rule must yield. *Lehman v. Hill*, 414 Ill. 173, 111 N.E.2d 120, 123 (1953).

█ A document which is a clear embodiment of the intent of the parties which has the purpose or effect of defrauding creditors of the bankruptcy estate is not protected by the parol evidence rule. A transferee of fraudulently conveyed funds cannot hide behind a contract which in fact defrauds creditors. If courts were barred from determining whether a fraudulent transfer occurred pursuant to a fully integrated contract, then the effect of the fraudulent conveyance statutes would be substantially thwarted. This Court will not allow the formal structure of a transaction to remove it from fraudulent transfer analysis. *See Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488 (N.D.Ill.1988). Consequently, parol evidence in the form of documents, testimony, and other evidence must be considered in order for the Court to ascertain whether a fraudulent conveyance has taken place.

█ The Court turns to the fraudulent transfer analysis. The Trustee bears the burden of proof on all the elements of a fraudulent transfer. *In re Damason Const. Corp.*, 101 B.R. 775, 777 (Bankr.M.D.Fla. 1989). In ascertaining whether a fraudulent conveyance has occurred the bankruptcy court should review the unique circumstances of each case. *See Matter of Bundles*, 856 F.2d 815 (7th Cir.1988).[16] Further, as a court of equity, this Court should delve behind the form of transactions and relationships to determine the substance. *In re United Energy Corp.*, 944 F.2d 589, 596 (9th Cir.1991). However, the Court's equitable powers "must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 969, 99 L.Ed.2d 169 (1988). Bankruptcy courts must heed the plain language of the statute unless it is demonstrably at odds with the intent of the

---

15. See Honorable Barry Russell, *Bankruptcy Evidence Manual* §§ 21–23 (1993) for a discussion of the parol evidence rule as applied to the Bankruptcy Code.

16. The Court notes that this proposition in the case *Matter of Bundles* was not disturbed by the Supreme Court case *BFP v. Resolution Trust Corp.*, —— U.S. ——, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). In that case, the Supreme Court

found that in the context of a noncollusive regularly conducted mortgage foreclosure sale, a rebuttable presumption arises that the amount paid by the purchaser is reasonably equivalent value. However, the Court strictly limited its holding to mortgage foreclosure sales. *Id.* at —— fn. 3, 114 S.Ct. at 1761 fn. 3. Therefore, the proposition cited in the Seventh Circuit's opinion remains intact.

drafters. *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

## TRANSFER OF AN INTEREST OF THE DEBTOR IN PROPERTY

■ In order to prove actual or constructive fraud, the Trustee must establish that there was a transfer of an interest of the debtor in property that was made or incurred within one year of the date of the filing of the petition. 11 U.S.C. § 548. The Defendants do not contest that the transfer of $1.4 million was made within one year before the date of the filing of FBN's bankruptcy petition. The most hotly debated issue in this proceeding is whether there was a transfer of an interest of the debtor in property.

■ "Transfer" is defined in Section 101(58)[54] of the Bankruptcy Code to encompass "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property." 11 U.S.C. § 101(58)[54]. Congress intended transfer to be construed as broadly as possible. H.R.Rep. No. 95–595, 95th Cong. 1st Sess. 314 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. As is evidenced in the definition, a transfer does not have to be made directly by a debtor. The term "transfer" as used in various bankruptcy statutes has been broad enough to cover such indirect transfers and to catch various circuitous arrangements which have the effect of a fraudulent conveyance. *Matter of Compton Corp.,* 831 F.2d 586, 591–92 (5th Cir.1987); *Katz v. First Nat. Bank of Glen Head,* 568 F.2d 964, 969 n. 4 (2nd Cir.1977), *cert. denied* 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978); *In re Grambling,* 99 B.R. 515, 517–18 (Bankr. D.Conn.1989). To combat circuity, courts have broken down transfers into two transfers, one direct, and one indirect. *Compton Corp.,* 831 F.2d at 591. In this proceeding, it is undisputed that a direct transfer occurred. Sizzler transferred $1.4 million to River Bank via a check payable to Quest Equities. This transfer is not the transfer which the Trustee seeks to avoid. Rather, the Trustee seeks to avoid the indirect transfer from FBN to River Bank, Quest Equities and/or Quest Realty. The Trustee contends that the fact pattern in this case is analogous to cases in which the Debtor directs a party to pay money due the Debtor to another party. If the effect of the transfer is to defraud creditors, the transfer will be avoided. An example of an indirect transfer is when A has a claim against B, and instead of B paying A directly for the claim, A directs B to pay C. The transfer from A to C is an indirect transfer of A's property. *See Virginia Nat. Bank v. Woodson,* 329 F.2d 836 (4th Cir.1964) (Indirect transfer occurred when debtor's sister made payment to Bank for debtor's overdrawn account); *Smith v. Patton,* 194 Ill. 638, 62 N.E. 794 (1902) (Pursuant to settlement agreement concerning a will contest, an indirect transfer occurred when will contestant directed legatee to transfer money to his daughter). In such a scenario, the debtor never has possession of the funds, but directs a third party to transfer those funds to a recipient. For fraudulent transfer purposes, the transaction is treated the same as if the debtor transferred the funds, instead of the third party.

As applied to this case, the Trustee contends that the third party is Sizzler, the Debtor is the transferor of the funds and River Bank, Quest Equities, or Quest Realty is the recipient or transferee. The critical question is whether an "interest of the Debtor in property" was in fact transferred. After the Settlement Agreement was consummated, FBN's cause of action against Sizzler was extinguished and the Debtor relinquished a valuable property right. The Debtor's signing of the Settlement Agreement and releasing its claims constituted an indirect transfer from FBN if the effect of releasing the Debtor's claims was the direct transfer of $1.4 million from Sizzler to River Bank. *See In re Atchison,* 101 B.R. 556, 557 (Bankr.S.D.Ill.1989). The Court must decide whether the Debtor had an interest in the $1.4 million transferred to River Bank by virtue of signing the Settlement Agreement and by releasing its claims.

■ The Bankruptcy Code does not define "an interest of the Debtor in property". The question of whether something is "property" of the estate is governed by fed-

eral law. *In re Ralar Distributors, Inc.,* 4 F.3d 62, 67 (1st Cir.1993). However, the nature and extent of the Debtor's enforceable interests in the property are questions of state law. *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979); *Ralar Distributors,* 4 F.3d at 67–68. Section 541 defines property of the estate as "all legal or equitable interests of the debtor in property". 11 U.S.C. § 541. By this expansive definition, Congress explicitly intended this provision to encompass all types of property in which the Debtor has an interest. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 367–368 (1977). Such property includes pending causes of action and claims owned by the Debtor. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205 n. 9, 103 S.Ct. 2309, 2313 n. 9, 76 L.Ed.2d 515 (1983); *In re Crysen/Montenay Energy Co.,* 902 F.2d 1098, 1101 (2nd Cir.1990). Illinois courts also consider causes of action to be property. *In re Marriage of Burt,* 144 Ill.App.3d 177, 98 Ill.Dec. 746, 747, 494 N.E.2d 868, 869 (4 Dist.1986); *People, for Use of Vancil Motor Co. v. Weaver,* 313 Ill.App. 317, 40 N.E.2d 83, 84 (3 Dist.1942). "Property" of the estate includes proceeds of "property" in the estate, which Congress intended to be equally as broad. H.R.Rep. No. 595, 95th Cong., 1st Sess. 367–368 (1977). "The conversion in form of property of the estate does not change its character as property of the estate." *Id.* Consequently, the claims of a debtor which are converted in form to a settlement amount or a judgment are still considered property of the estate. *See Matter of Besing,* 981 F.2d 1488 (5th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 79, 126 L.Ed.2d 47 (1993).

In *Matter of Besing,* the Fifth Circuit Court of Appeals examined whether a state court entering a judgment dismissing a debtor's tort and contract claims constituted a transfer of an interest of the debtor in property under Section 548. 981 F.2d 1488. Noting the all-encompassing definition of "property" in the Code, and the fact that Texas state law recognizes causes of action and claims as interests in property, the Fifth

Circuit held that the debtor's claims as embodied in a complaint constituted an interest in property. *Id.* at 1493. When the state court entered a judgment dismissing the debtor's complaint and thereby the claims, a transfer of an interest of the debtor occurred. *Id.* at 1494. The Court of Appeals determined that the debtor's interest in those claims had no value because entry of a judgment dismissing the claims as embodied in a complaint constituted an adjudication of the claims which had no merit.[17] *Id.* at 1495–96.

■ As in the *Besing* case, prior to FBN executing the Settlement Agreement and releasing all of its claims, the Debtor had a property interest in the claims in the FBN Complaint. Those claims were for fraud, misrepresentation, and claims based on Sizzler's discriminating treatment of FBN as compared to other Sizzler franchisees. The $1.4 million indirectly transferred by FBN was part of the proceeds realized from Sizzler's payment of FBN's claims. Therefore, the Debtor had an interest in the $1.4 million transferred to River Bank.

■ The next question the Court must address is the amount of the Debtor's interest in the funds transferred. However, unlike the tort and contract claims in *Besing* which had no value after the state court dismissal of the claims, the claims in the FBN Complaint were valued at a specific dollar amount as evidenced by the amount distributed by Sizzler in the Settlement Agreement. The Settlement Agreement itself provides that FBN would receive $250,000, River Bank would receive $625,000, SFSA would receive $1.8 million, and Quest Equities would receive $1.4 million. Aside from the $1.5 million to SFSA for the real estate, the rest of the money was in settlement of FBN's claims. The Defendants admit that the transfers to River Bank, SFSA, and FBN were all directly to FBN or went to other entities to indirectly benefit FBN. Pursuant to the Settlement Agreement, Sizzler paid $250,000 to FBN directly. Further,

---

**17.** The Fifth Circuit determined the value of the Debtor's interest in the claims to determine whether reasonably equivalent value was ex-

changed for that value. Reasonably equivalent value is discussed *infra.*

Sizzler paid $300,000 to SFSA for a loan which SFSA had made to FBN. Sizzler paid River Bank $625,000 in order to repay a loan which eventually went to FBN. Therefore, with the glaring exception of the $1.4 million, the remainder of the payments made by Sizzler for settlement of claims were to benefit FBN.

It is clear from the testimony of Sizzler's president, Thomas Gregory, that Sizzler wanted to settle the FBN Complaint and the Sizzler Arbitration, but MRC did not have any assets that Sizzler wanted. MRC, unlike FBN, leased the restaurant facilities and hard assets directly from Sizzler. Sizzler had regained possession of MRC's hard assets, including the restaurant facilities, and had claims against MRC for the breach of the various leases. Consequently, although Sizzler wanted to settle with MRC, Sizzler had no reason to pay money to facilitate that settlement. Further, this is confirmed by the Settlement Agreement and the evidence presented in this case. Sizzler did not pay any money to MRC. This is also supported by the testimony of Philip Stahl, River Bank and Quest Equities' counsel, who stated that MRC's claims had no value and that MRC would be "creamed" at the Sizzler Arbitration.

Further, prior to the apportionment of the lump sum amount, Gregory for Sizzler, and Basile for FBN, were the parties negotiating the settlement amount. It is clear from the Settlement Agreement that Sizzler was paying $1.5 million to SFSA for the purchase of certain property. The remainder of the lump sum, or $2,675,000 was to pay FBN for the various claims it had asserted. Sizzler and FBN were in the best position to evaluate the circumstances and determine the value of FBN's claims, as offset by Sizzler's claims. *Restatement of Contracts*, Ch. 4, § 79, p. 201–02. This is especially true since FBN and Sizzler negotiated at arms length, and there are no allegations of fraud as between Sizzler and FBN during the negotiation process. Therefore, MRC's claims by all accounts were worthless and Sizzler was only willing to pay money to settle FBN's claims. Consequently, the Court finds FBN's claims to be valued at $2,675,000.

Like the tort and contract claims in *Besing*, the conversion of FBN's claims into a specific dollar amount did not extinguish FBN's interest. Furthermore, the funds distributed pursuant to the Settlement Agreement·were part of the proceeds realized from the settlement of FBN's claims. Pursuant to the Settlement Agreement and FBN releasing its claims, Sizzler made a check payable for $1.5 million to Quest Equities. When FBN agreed to the Settlement Agreement, it directed and acquiesced to Sizzler distributing $1.5 million directly to Quest Equities, and thereby River Bank. Therefore, a "transfer of the interest of the Debtor in property" was effectuated within the meaning of Section 548.

The Defendants argue that the Debtor had no control over the funds transferred citing such cases as *In re Chase & Sanborn Corp.,* 813 F.2d 1177 (11th Cir.1987) in support of their "control test" theory. In *Chase & Sanborn,* the debtor corporation obtained a checking account for the sole purpose of laundering money. The Court looked to the "entire circumstances of the transaction" to find the debtor did not have control over funds which were the personal funds of the debtor's president. Application of the control test in this case leads this court to the inescapable conclusion that the $1.4 million transferred were funds of the estate. In *Chase & Sanborn,* the interest of the debtor was fleeting because the money was originally the debtor's president's, and the only interest of the debtor was when the money passed in and out of accounts in the debtor's name. In this case, the Debtor's property was the claims in the FBN Complaint which had been pending for seven months. If the Settlement Agreement had not been signed, the Debtor would still have been in control of its causes of action and claims at the time of the bankruptcy filing.

### ACTUAL FRAUDULENT INTENT

The Court turns next to the issue of whether the transfer of $1.4 million from FBN was made with actual intent to hinder, delay, or defraud creditors pursuant to Section 548(a)(1) of the Bankruptcy Code. Among the badges of fraud are the " 'existence of an unconscionable discrepancy be-

tween the value of property transferred and the consideration received therefor * * * [or] the fact that the transferee was an officer or was an agent or creditor of an officer of an embarrassed corporate transferor.' " *In re Vaniman Intern., Inc.*, 22 B.R. 166, 182 (Bankr.E.D.N.Y.1982) [citation omitted]. Further, the Seventh Circuit has recognized the potential dire consequences to the creditors of a corporation when insiders have guaranteed the liabilities of a debtor. *Levit v. Ingersoll Rand Financial Corp.*, 874 F.2d 1186 (7th Cir.1989) (When payment produces benefit for insider/guarantor, preference period for recovery is extended to one year). Therefore, the transactions of insiders must be rigorously scrutinized. To protect the assets of a Debtor from actions taken by insiders, courts recognize that when a transferee is in a position to dominate or control the debtor's disposition of property, the transferee's intent to hinder, delay, or defraud will be imputed to the debtor/transferor.[18] *In re Southern Land Title Corp.*, 474 F.2d 1033, 1038 (5th Cir.1973); *In re Roco Corp*, 701 F.2d 978, 984 (1st Cir.1983); *Vaniman*, 22 B.R. at 182; *In re Formaggio Mfg., Inc.*, 23 B.R. 688, 691 (Bankr.D.R.I.1982).

There are two questions the Court must answer at this point. First, who is the transferee? Second, was the transferee in the position to control or dominate the Debtor's disposition of property? As to the first question, the Court finds River Bank is the transferee of the $1.4 million. The term "transferee" is utilized in Section 550 of the Bankruptcy Code.[19] In construing that term, the Seventh Circuit Court of Appeals has stated that the " '[t]ransferee' is not a self defining term; it must mean something different from 'possessor' or 'holder' or 'agent' ". *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 894 (7th Cir.1988). In *Bonded Financial*, the

Seventh Circuit held that the "minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purpose." 838 F.2d at 893. The Court of Appeals recognized that a "transferee" for purposes of Section 550 is not necessarily the recipient of the funds. The Seventh Circuit noted that recovery under Section 550 should be based on identifying the entity which had control over the assets. *Id.* at 893 *citing Mayo v. Pioneer Bank & Trust Co.*, 270 F.2d 823, 830 (5th Cir.1959) (disregarding corporate forms in order to identify the entity with control over the assets). From the evidence presented, the Court concludes that River Bank had control and dominion over the $1.4 million transferred from Sizzler. According to the testimony, the $7.5 million mortgage note was assigned to Quest Realty, however, there is no evidence of that assignment, or that any consideration was given by Quest Realty for the mortgage note. It is clear from the evidence and the testimony that Quest Realty, was a mere conduit that had no control over the funds. *See In re Chase & Sanborn Corp.*, 848 F.2d 1196, 1199–1200 (11th Cir.1988); *Bonded Financial*, 838 F.2d at 893. To the extent, that Quest Realty was holding the $1.4 million, it was merely holding those funds for River Bank. As to Quest Equities, although the $1.4 million check from Sizzler was made payable to Quest Equities, Quest Equities did not exercise control or dominion over the funds. The purpose of Section 550 is to preclude multiple transfers of convoluted business transactions from frustrating the recovery of avoidable transfers. *In re Fabric Buys of Jericho, Inc.*, 33 B.R. 334 (Bankr.S.D.N.Y.1983). Quest Equities and Quest Realty, as commercial entities were controlled and bound by the direction of River Bank. *See Bonded Financial*, 838 F.2d at 893; *Matter of Musurlian*, 97 B.R. 985, 988 (Bankr.W.D.Wis.1989). Quest Equi-

---

18. Whether a transferee has control over the debtor is a separate issue from whether the debtor has control over property, which was discussed *supra*.

19. Section 550 states in relevant part:
 (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
 (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
 (2) any immediate or mediate transferee of such initial transferee.

ties acted as an agent for River Bank for the purposes of obtaining the $1.4 million from Sizzler. *See Bonded Financial,* 838 F.2d at 893 ("When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded."). Further, in February 1992, when the mortgage note was eventually transferred to ANB in partial settlement of ANB's action against River Bank, it was transferred by River Bank, not by Quest Equities or Quest Realty. Importantly, River Bank admitted that it credited $1.4 million against the liability on the River Bank Loan.

 The second question the Court must address, is whether River Bank was in a position to dominate or control FBN's disposition of property. In *Southern Land Title,* the Court examined the extent of control or domination that a shareholder/director of the transferee corporation had over the officers of the Debtors. 474 F.2d 1033. In this case, the evidence shows that Waxman, acting on behalf of Quest Equities, which was an insider of the Debtor, and acting on behalf of River Bank controlled and dominated Basile and Kaufman, two other insiders of the Debtor, in order to direct the transfer of money via the Settlement Agreement to River Bank. At the time of the Settlement Conference, FBN was not operating, was insolvent, and was incurring legal fees which it was incapable of paying. It would have been difficult if not impossible, for FBN to continue the prosecution of the FBN Complaint and the defense of other lawsuits. FBN's board of directors consisted of Basile, Kaufman, and a representative of Quest Equities. FBN could only act through those officers and directors. Quest Equities held a promissory note from Basile for $100,000. Even though it had previously been forgiven, Waxman threatened Basile with the revival of that note at the Settlement Conference. Basile knew a possible consequence of that revival would be the loss of his home and sailboat. Further, Basile was personally liable on numerous guarantees in the Sizzler Arbitration. When Basile signed the Settlement Agreement, he knew that he would be released from his debts to Sizzler from the Affiliate Agreement and the guarantees on the license agreements which were all at issue in the FBN Complaint and the Sizzler Arbitration.

Further, Basile knew that River Bank and Quest Equities could and would enforce his $100,000 promissory note. Importantly, Basile as much as admitted at trial that he executed the Settlement Agreement, on behalf of FBN, because he was afraid River Bank would enforce the $100,000 note. Basile agreed to the transfer even though he was aware that the funds should have been paid to FBN for the benefit of its creditors because he personally benefitted from the settlement.

Kaufman was in favor of the Settlement Agreement and was pressuring Basile to sign it. Prior to and during September 1990, Kaufman was engaged in a business relationship with River Bank, unrelated to FBN, by the terms of which Kaufman had personally guaranteed between $8 million and $9 million in loans. As a result of the Settlement Agreement, Kaufman was released from his obligations to Sizzler pursuant to the various guarantees and therefore, he personally benefitted because payment of a portion of the settlement funds was given to River Bank. Consequently, Kaufman was pressuring Basile to sign the Settlement Agreement. Waxman's control over Basile and Kaufman meant Quest Equities and River Bank was in a position to insist upon a portion of the lump sum settlement amount in order pay down the River Bank Loan. Waxman used his position and influence to ensure that Quest Equities, and therefore River Bank received funds. This was evidenced by Waxman's threat of enforcing Basile's $100,000 promissory note, by his dictation of the Settlement Agreement, and later demand that River Bank receive more money pursuant to the Side Agreement.

The Court finds that River Bank intended to defraud FBN's creditors and that fraudulent intent is imputed to the Debtor. The Court's finding of actual fraudulent intent is supported by River Bank's "general scheme or plan to strip the Debtor of its assets with no regard to the needs of the creditors." *In re F & C Services, Inc.,* 44 B.R. 863, 872 (Bankr.S.D.Fla.1984). Although FBN may have benefitted from the Settlement Agreement as a whole, FBN received no consideration in return for the transfer of $1.4 million

to River Bank. It is clear from the evidence that Waxman, as a representative of River Bank, attended the Settlement Conference and manipulated the payment of the settlement proceeds in order to obtain funds to pay down the non-performing $7.5 million loan to SFSA. Due to River Bank's agreement to subordinate the $7.5 million loan to ANB's loan to SFSA, River Bank knew the chances of ANB receiving payment on the ANB Loan were slim, and River Bank receiving payment on its $7.5 million loan next to impossible. River Bank had attempted several times to get rid of the River Bank Loan through the efforts of Landberg and Mann. Therefore, River Bank, as noted by Stephen Mann, needed a "plan" to get money and turned to another source of funds in order to obtain money for its bad loan. Through its stronghold on Kaufman and Basile, Waxman and thereby River Bank was able to force the transfer of FBN's assets out of the reach of FBN's creditors, and out of the reach of ANB, and to preserve those assets for River Bank. Finding the deep pocket it needed in Sizzler, River Bank, through their exercise of control over FBN, insisted upon receiving $1.4 million which should have gone to FBN. Sizzler, although settling with FBN for a lump sum, turned a blind eye when it came to the particulars of the Settlement Agreement which provided for the distribution of the lump sum. Sizzler wanted a settlement and they wanted to be released from liability. Therefore, the Court finds that FBN, as controlled by River Bank, intended to defraud the FBN creditors by transferring funds in which FBN had an interest to River Bank. Consequently, the Court finds that the transfer of $1.4 million to River Bank is avoided.

## CONSTRUCTIVE FRAUDULENT INTENT

■ The next issue for the Court to address is whether FBN voluntarily or involuntarily received less than reasonably equivalent value from River Bank in exchange for the transfer while FBN was insolvent or became insolvent. The term "reasonably equivalent value" is not defined in the Code. However, for purposes of Section 548, "value" is defined as "property, or satisfaction or securing of a present or antecedent debt of

the debtor ...". In determining whether the Debtor received reasonably equivalent value the Court must focus on what the Debtor received in return for what it surrendered. See In re Grabill Corp., 121 B.R. 983, 994 (Bankr.N.D.Ill.1990). The bargaining position of the parties and their relationship should be examined to determine that the value transferred is disproportionately small compared to the value actually received by the Debtor. In re Ozark Restaurant Equipment Co., Inc., 850 F.2d 342 (8th Cir.1988).

■ The question of reasonably equivalent value must be limited to the value of what FBN received in exchange for River Bank's receipt of $1.4 million. Damason, 101 B.R. at 778 ("the focus is limited solely to the value of the property or services given to the debtor in exchange for the transfer"). The Court finds nothing tangible or intangible flowed to FBN from River Bank. It is well established that transfers which are solely for the benefit of third parties are not for reasonably equivalent value. In re Computer Universe Inc., 58 B.R. 28, 30 (Bankr. M.D.Fla.1986); see Bullard v. Aluminum Co. of America, 468 F.2d 11 (7th Cir.1972) (Payment of third-party debts is not fair consideration).

■ Further, a bankruptcy trustee may avoid transfers made by a debtor to pay valid debts of a corporate affiliate. In re Rodriguez, 895 F.2d 725 (11th Cir.1990); Rubin Manufacturers Hanover Trust Co., 661 F.2d 979, 991 (2nd Cir.1981); In re C–T of Virginia, Inc., 124 B.R. 700, 702 (W.D.Va.1990). Courts have carved an exception to this rule when a debtor indirectly benefitted from the transfer of the property to find that reasonably equivalent value was given. In re Bowers–Siemon Chemicals Co., 139 B.R. 436, 444 (Bankr.N.D.Ill.1992); In re Corporate Jet Aviation, Inc., 45 B.R. 629, 635–36 (Bankr. N.D.Ga.1985).

FBN did not receive any direct or indirect benefit from the $1.4 million transfer to River Bank. FBN did not have any liability on the River Bank Loan, so consequently its liability on that loan was not reduced. FBN did not profit when River Bank utilized FBN's property (i.e. the $1.4 million) to cred-

it the River Bank Loan. Further, FBN did not secure any future financing from River Bank as a result of the transfer. *See In re Marquis Products, Inc.,* 150 B.R. 487 (Bankr.D.Me.1993). River Bank was the only party that benefitted from the transfer of the $1.4 million because it reduced River Bank's liability on the River Bank Loan.

Defendants argue that FBN benefitted from River Bank's receipt of the $1.4 million because the Settlement Agreement would not have occurred but for the participation of River Bank and Quest Equities. In order to effectuate the distribution as outlined by Waxman in the Settlement Agreement, Sizzler surely would have wanted the signatures of River Bank and Quest Equities to the Settlement Agreement. However, there is no credible evidence that the Settlement Agreement would not have happened without the participation of Quest Equities and River Bank. Further as to Quest Equities, Sizzler filed a counterclaim to the FBN Complaint alleging that Quest Equities was the alter ego of FBN. Since Sizzler and Quest Equities were adversaries in the FBN Complaint, it is obvious that Sizzler would have wanted them to be parties to the settlement of that lawsuit in order to ensure FBN's approval of the Settlement Agreement.

Defendants next argument is that FBN benefitted from the Settlement Agreement due to Sizzler's release of its claims against FBN in the pending litigation, the payment of $250,000 by Sizzler to FBN, the payment of FBN's $100,000 legal bill, the payment of the loan of $625,000 which originated with River Bank, and the payment of the $300,000 loan from SFSA. The Defendants contend that the release of a claim in a settlement agreement is considered reasonably equivalent value even if the Debtor entered into the settlement to avoid the nuisance of the claim.[20] The Defendants cite *In re Pinto Trucking Service, Inc.,* 93 B.R. 379 (Bankr. E.D.Pa.1988) for support. This case is distinguishable from *Pinto.* The *Pinto* court found that the settlement was negotiated at

arm's length, with not even a suggestion of collusion. 93 B.R. at 386. The same judge in a later case stated that the release pursuant to the settlement agreement in *Pinto* was reasonably equivalent in value due to the fact that the settlement there was so unobjectionable. *In re Joshua Slocum, Ltd.,* 103 B.R. 610, 619–20 (Bankr.E.D.Pa.1989), *aff'd,* 121 B.R. 442 (E.D.Pa.1989). The judge stated that "[i]t was *only* with these layers of assurances that the settlement agreement was totally fair" *Id.* (emphasis added).

The "agreement" between the FBN group to disburse the funds after the settlement was reached between Sizzler and FBN does not have the safeguards relied upon by the court in *Pinto.* The "agreement" was clearly not negotiated at arms length. Quest Equities and River Bank, via Waxman, had control over the Debtor by virtue of a financial stronghold over the Debtor's shareholders, Basile and Kaufman.

Even if the *Pinto* case were not distinguishable, all benefits exchanged between the transferor and the transferee should be quantified. This Court has a duty to analyze the value of any alleged claims of River Bank against the Debtor to ensure that reasonably equivalent value was given to release the claim. For example, in *In re Edward Harvey Co., Inc.,* 68 B.R. 851, 859 (Bankr. D.Mass.1987), the Court determined reasonably equivalent value was not given when it compared the value of a lease option worth $517,000 to releases and other consideration allegedly given by the Debtor. In *In re Lange,* 35 B.R. 579, 586–87 (Bankr.E.D.Mo. 1983), the Trustee sought to avoid the conveyance of a parcel of real estate from the Debtor to his ex-wife. The Court found the waiver by the Debtor's ex-wife of her maintenance payments did not constitute reasonably equivalent value for the real estate when the Debtor's ex-wife was not entitled to maintenance payments under state law. In this case, FBN directed the transfer of $1.5 million to River Bank by releasing its claims

---

**20.** This is also the alleged consideration for the payment by Sizzler of $1.4 million for purported release of the "specter" of Quest Equities "claims" against Sizzler. The facts demonstrate that Quest Equities had no claims against Siz-

zler, that Sizzler was not settling with Quest Equities and that Sizzler was paying FBN. Accordingly, the Defendants' argument is without merit.

**690**

against Sizzler valued at $2,675,000 and received nothing in return from River Bank, or any subsidiary of River Bank, i.e. Quest Equities and Quest Realty. Therefore, the Court finds that FBN received less than reasonably equivalent value from River Bank in exchange for the $1.4 million.

Turning its attention to the question of whether the Debtor was insolvent on the date of the transfer, the Court finds there is little dispute that the Debtor was indeed insolvent. Insolvency under the Bankruptcy Code is where the fair value of the debtor's non-exempt assets amount to less than the amount of the debtor's liabilities. 11 U.S.C. § 101(32)(A). Courts employ a balance sheet test to compare the debtor's debts with the debtor's assets. *See Matter of Xonics Photochemical, Inc.*, 841 F.2d 198 (7th Cir.1988); *In re Vurchio*, 107 B.R. 363, 365 (Bankr.M.D.Fla.1989). Further, courts often rely on unaudited financial statements as the best available evidence of insolvency. *See e.g., In re Roco Corp.*, 701 F.2d 978, 983 (1st Cir.1983). In this case, FBN's unaudited balance sheet and profit and loss statement for the period ending October 9, 1990, clearly demonstrate that at the time of the transfer, FBN's liabilities exceeded its assets by over $3 million. Also, Anthony Basile, a certified public accountant and the president of FBN, testified that as of the time of the transfer FBN was no longer in business, had no income, had limited assets and that its liabilities exceeded its assets by $3 million. Further, the Defendants have not attempted to rebut the evidence that FBN was insolvent. Therefore, the Court finds that at the time for the transfer, in September 1990, FBN was insolvent.

### CLAIMS FILED IN THE BANKRUPTCY CASE

The last argument to address is the Defendant's contention that insiders of the Debtor will improperly benefit from the avoidance of a fraudulent transfer. According to the Defendants, SFSA filed a claim in this bankruptcy case which constitutes 80% of all the claims filed. Therefore, if the $1.4 million transferred to River Bank is avoided and returned to the estate, upon a distribution the owners of SFSA, Anthony Basile, SIG Partners, and Quest Equities, would benefit. Despite the Defendants argument, there is no requirement in Section 548 that the Trustee may not avoid a transfer if it happens to indirectly benefit the insiders of the Debtor. On the contrary, Section 548 contemplates that the Trustee could avoid a fraudulent transfer even if it had the effect of benefitting an insider of a debtor. *See* 11 U.S.C. § 548 ("[t]he trustee may avoid *any* transfer") (emphasis added).

### SECTION 550

Section 550 governs the Trustee's right of recovery against the Defendants. Section 550 provides that to the extent a transfer is avoided under Section 548, the Trustee may recover the property transferred or the value of the property from "the initial transferee of such transfer or the entity for whose benefit such transfer was made." 11 U.S.C. § 550(a)(1); *Wieboldt Stores, Inc. v. Schottenstein*, 131 B.R. 655, 665 (N.D.Ill.1991). As analyzed *supra*, River Bank is the initial transferee, and therefore the $1.4 million transfer is recoverable from River Bank.

### INTEREST

The Bankruptcy Code does not specify whether the Court may award prejudgment interest to a prevailing trustee. *In re Investment Bankers, Inc.*, 4 F.3d 1556, 1566 (10th Cir.1993), *cert. denied, Davis, Gillenwater & Lynch v. Turner*, — U.S. —, 114 S.Ct. 1061, 127 L.Ed.2d 381 (1994). However, bankruptcy courts have the discretion to award prejudgment interest to a trustee in a fraudulent conveyance action. *Investment Bankers*, 4 F.3d at 1566; *Arthur Young & Co. v. Reves*, 937 F.2d 1310 (8th Cir.1991); *In re Cybermech, Inc.*, 13 F.3d 818, 822 (4th Cir.1994). The purpose of allowing prejudgment interest is to enable a prevailing plaintiff to be made whole in the absence of countervailing equities or statutory prohibition. *In re Investment Bankers, Inc.*, 135 B.R. 659, 665 (Bankr.D.Colo.1991). Prejudgment interest is essential to compensate the prevailing party for the lost time value of money. *NLRB v. International*

*Measurement and Control Co., Inc.*, 978 F.2d 334, 336–37 (7th Cir.1992). Therefore, prejudgment interest shall be awarded and commence from the date that the adversary complaint was filed, July 9, 1992. The Trustee shall be entitled to prejudgment interest at the rate specified by 28 U.S.C. § 1961 and a judgment order will be entered accordingly. Each party shall bear its own costs.

## CONCLUSION

Although surely not a case book example of a fraudulent conveyance transfer, the facts in this case epitomize what fraudulent transfer law is designed to prohibit; "placing the assets of a financially ailing corporation where insiders can reach them, but creditors cannot." *Vaniman*, 22 B.R. at 181. The transfer of $1.4 million from FBN to River Bank is hereby avoided. Pursuant to Section 550, the Trustee may recover for the benefit of the estate, $1.4 million from River Bank, the initial transferee. The Trustee's request to avoid the fraudulent transfer in the amount of $1.4 million from FBN to Quest Equities and Quest Realty is hereby denied. The Court dismisses Quest Equities and Quest Realty as defendants.